**Jimmy Dale SMITH**

v.

**Donal CAMPBELL, Warden.**

**No. 1:88–0456.**

United States District Court,
M.D. Tennessee,
Columbia Division.

Nov. 19, 1991.

MEMORANDUM

JOHN T. NIXON, Chief Judge.

This case involves a habeas corpus petition filed pursuant to 28 U.S.C. § 2254. Petitioner's primary claim is that his guilty plea, entered near the conclusion of a jury trial in this matter, was involuntary and unintelligent insofar as his counsel's constitutionally deficient representation required him to enter the plea. The Court has received the Magistrate's Report and Recommendation in this matter, to which objections have been filed.[1] The Magistrate concluded that petitioner's arguments have no merit and therefore recommended that the petition be dismissed. For the reasons stated below, the Court will adopt the Magistrate's Report and Recommendation, as modified by this Memorandum. Accordingly, the petition for habeas corpus will be dismissed.

## BACKGROUND

On the evening of January 23, 1982, Jim Brooks and Ella Pittman were shot during a robbery attempt outside of the Brooks Cash Store. Mr. Brooks, with the daily receipts of the store, had just entered his truck in the parking lot when he was approached by a masked man with a gun. The gunman said, "damit Jimmy, throw that money out here, or I'll shoot you." Rather than comply with this request, Brooks attempted to start his truck and flee. At this point, the robber shot Brooks through the truck's door, hitting him in the leg. The door was then opened and Brooks was shot two more times at point blank range.

Meanwhile, Brooks' niece, Kendalle Pittman, saw the robbery in progress. After alerting her parents, Ella and Ken Pittman, and her aunt Betty Wright, and attempting to frighten the robber away to no avail, she rammed her jeep into the gunman, temporarily pinning him between the jeep and the truck and causing him to drop his gun.

Deborah S. Swettenam, Federal Public Defender's Office, Nashville, Tenn., for petitioner.

Bettye Springfield–Carter, Office of the Atty. Gen., Nashville, Tenn., for respondent.

1. This petition was referred to Magistrate Kent Sandidge on December 5, 1989, pursuant to 28 U.S.C. § 636(b)(1)(B).

Ella Pittman arrived on the scene and, while struggling with the robber, pulled off his mask and observed his face from distance of approximately one foot. She later identified the defendant, Jimmy Dale Smith, as the robber.

According to the testimony, the defendant fled and Mrs. Pittman recovered the gun he had dropped. In an apparent effort to retrieve the money, the defendant returned and, drawing a second weapon, exchanged gunfire with Mrs. Pittman who was struck first in her lower body while a second shot was deflected by the frame of her eyeglasses. Mrs. Pittman managed to fire two shots at the defendant and she believed at least one had found its mark. The defendant then fled.

Ownership of the gun found at the scene of the crime was traced to the defendant. With this established, Agent David Ray of the Tennessee Bureau of Investigation [TBI] acquired a photograph of the defendant along with a "photo pack." A photo pack is a collection of photographs of various people to be used as part of a photo array. Three days after the robbery, Agent Ray visited Mrs. Pittman in the hospital and showed her an array of eight photographs, one of which was of the defendant. The testimony indicated that the photographs were of men possessing similar characteristics and that the defendant's photo was located fifth in the array. Mrs. Pittman, without hesitation, identified Jimmy Dale Smith as the robber. At the trial, Mrs. Pittman made a positive in-court identification of the defendant as the perpetrator of the crime. Smith was an acquaintance of Jim Brooks and so would have known to call him "Jimmy" during the robbery.

When Smith was arrested, it was discovered that he had a bullet wound in his back. A forensic pathologist testified at the trial that the wound was consistent with that caused by the weapon Mrs. Pittman fired and, from the appearance of the wound, he determined that it was inflicted on or about January 23, 1982—the day of the crime. The defendant's ex-wife, Judy Smith Meadows, testified that on the evening of January 23, 1982, Mr. Smith returned home late and informed her that he had injured his back with a chain saw. Later, when he was arrested, he told the police this same story. The pathologist testified, however, that the wound on the defendant's back could not have been suffered from a chain saw accident.

Counsel for the defense made no pre-trial motion to suppress the photographic array testimony. The defendant did not take the stand until after the prosecution's rebuttal case when, out of the presence of the jury, the trial court heard Mr. Smith's proposed testimony. The court found that Mr. Smith's desire to testify came to late and that his testimony would not be proper in rebuttal. Accordingly, the court denied him the opportunity to testify before the jury.

At the close of all the evidence, the defendant informed the court of his desire to change his plea pursuant to an agreement with the State. After extensive questioning of Mr. Smith, the court accepted the plea, finding the defendant to be satisfied with his counsel's representation and competent to voluntarily waive his rights. Smith pleaded guilty to two counts of assault with attempt to commit murder and one count of armed robbery. Although the defendant faced the possibility of several life terms for his crime, the court abided by the plea agreement and sentenced Smith to three 60 year terms to be served concurrently.

On April 12, 1985, petitioner filed for state post conviction relief. Counsel was appointed to represent Smith and a hearing was held on September 9, 1986, at which time Smith fired his attorney. The Criminal Court for Fentress County determined that Smith did receive effective assistance of counsel and that his guilty plea was knowingly and intelligently made. This decision was upheld by the Court of Criminal Appeals on June 17, 1988. Application to appeal to the Supreme Court of Tennessee was denied on October 3, 1988.

Smith filed the current petition for habe-

as corpus on November 17, 1988.[2] While it was and is evident from Smith's numerous and lengthy filings that he is quite literate, the rather disorganized fashion in which he presented his claims made it difficult to discern the precise nature of his serious allegations. Therefore, counsel was appointed to represent him.[3]

Petitioner's grounds for relief are essentially based upon ineffective assistance of counsel. Specifically, petitioner, through his appointed attorney, asserts that trial counsel rendered ineffective assistance by (1) failing to file and litigate any motion to suppress the out-of-court identification of the petitioner in a photographic line-up and the in-court identification of the petitioner by Ella Pittman; (2) failing to investigate and present evidence of the petitioner's history of medical problems with his leg to rebut the State's inference that the petitioner was the perpetrator because at the time of his arrest, the condition of his leg was consistent with having been pinned by an automobile as the perpetrator had been;

(3) closing the defense proof at trial without presenting the petitioner as a witness on his own behalf; and (4) representing to the petitioner that counsel could arrange for an early release from prison if the petitioner pled guilty. Counsel argues that the third ground for relief includes the additional claim that petitioner was denied the right to testify on his own behalf.

The petitioner has supplemented his counsel's briefs with extensive handwritten filings and copies of his state appellate briefs. As best as the Court can make sense of these, he asserts in addition to the above claims, that (a) trial counsel was involved in a conspiracy dating to the mid–1970s to have petitioner incarcerated; (b) that he was not competent to plead guilty insofar as he had had little sleep, was suffering from an infected backwound, believed he was suffering from cancer or a heart condition, was under the influence of pills his trial counsel had given him, the jail conditions were poor, and the high cholesterol food he had been eating affected his

2. This case was originally before Senior Judge Neese and was reassigned to this Court in November, 1989.

3. Despite the appointment of counsel, petitioner continued to supplement his counsel's briefs with additional filings. Mr. Smith's briefs, while becoming more metaphorical, have not become clearer with the passage of time. His brief in opposition to the Magistrate's Report and Recommendation begins as follows:

> Your petitioner scopes the totality of the Majestrates [sic] opinion and recommendations as a whole and avers it echoes the Hellenized—*akin to harmony*—of the Tennessee justice system that it is wanting, and is 3000 years behind the times and as dead as ancient Greece where it was born and died according to its ways of underminding [sic] truth and holiness in justice, and the citizens of state.
> Notwithstanding a Hellenized justice system of Greece put to death Socrates, Anaxagoras and Anaxagoras [sic] three of the greatest thinkers in the Pericean age. For religious reasons, solely, as, in Tennessee courts *akin to harmony*, hearing-only-what they want to hear-in-a matter. Being fiction and not truth before him.
> This is 1991, and your petitioner has long awaited his day in court. Expecting a 1776 Constitutional day, a 200 year old Bill of Rights in 1991 to unfold, and what does he get, not even a English type due process, nor the holiness of scripture law of the Sanhedrin

court of Israel our constitution was molded after, but, as, found a decision as, if, out of Greece 3000 years ago, Rome 1900 years ago or even France before the revolution.
> We have here as Egyptian inscription-plagurized [sic]-reading of phansty [sic] as Egypt inventing their past to make them (defendants) look good-at-its-core, as the Mayan writings of South America unreadable or undecipherable to the all seeing eye but to impress the Hellenized reader it so favors contrary to Constitutional law.

> Magistrate Sandridge [sic] has long suffered from physical disabilities of vision. He sees only in winks and blinks, as lightning in a nights storm, it is reflected in his Recommendation and opinions as follows, denying your petitioner his full day in court. *Fact from fiction:* Many here have complained on the Magistrate. This petitioner's work is definitive and distinctive, and please credit me accordingly with what I submit to this Honorable Court. It has been contended that Mr. Sandidge, the magistrate, is "beyond" the potential to properly analyze & review cases that contain in depth factors relating to numerous issues. While I do *not* conclusively think that his analytic capabilities are impaired or handicapped by his *age* & mental state, I *know* that an unconstitutional process produced the magistrate's decision. Could some law clerk have interjected too much influence in this case?

judgment; (c) that he was not informed of the collateral consequences of his plea by the trial court; (d) that the both the trial transcript and the post conviction hearing transcript had been altered; (e) that the State knowingly used false evidence, namely, that the gun introduced at the trial was not owned by him as the State claimed; (f) that trial counsel should not have called petitioner's ex-wife to testify; and (g) that there was an undue delay in the state post-conviction proceedings. Present throughout his filings is the repeated assertion that he is innocent and that the initial description of the robber given by Mrs. Pittman the day of the crime is inconsistent with his actual appearance.[4]

### DISCUSSION

At the outset, it must be noted that the writ of habeas corpus is not a tool for the redetermination of a prisoner's guilt or innocence. The writ exists only to safeguard the constitutional and federal rights of persons held in custody. 28 U.S.C. § 2254(a). *Moore v. Dempsey,* 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (Holmes, J.). Whether or not the petitioner asserts his innocence is irrelevant to this proceeding and cannot be considered.[5]

### I. *Ineffective Assistance of Counsel.*

There can be no doubt that Mr. Smith has a distrust for lawyers. Besides alleging ineffective assistance of counsel and conspiracy on the part of Arnold Peebles, his trial counsel, petitioner fired Patrick O'Rourke, the attorney appointed to represent him at his state post conviction hearing. Mr. Smith expressed some dissatisfaction with Susan Kay, who represented him on appeal. Of his current counsel, Deborah Swettenam, he says,

> coming on as Helen of Troy, here as the public defender of record, a Joan of Ark [sic], in outer appearance, and at her core, no more that the court jester even ancient Greece learned the sword came

into the World, because justice delayed was justice denied, and the world survives, only on the pillars of justice, all exnations, lies [sic] in ashes and ruins because it neglected justice and Hellenized its ways to akin to harmony, not truth and holiness.

> Notwithstanding your petitioner has tried to gather evidence of support back in the original court of sentencing, and even the chancelors [sic] court to obtain the tapes needed as direct evidence *counsel, Swettenam, has failed to acquire as proof,* and your petitioner was denied same. . . .

Petitioner's Petition to Object to Magistrate's Report and Recommendation, at 2 (filed April 26, 1991) (emphasis in original). The Court has learned from another lawsuit filed by petitioner that he is currently suing Jennifer Roberts and Stephen Stuart, two attorneys who had represented him in another matter. In his present petition, however, he raises only the conduct of Mr. Peebles as a ground for relief.

To state a claim for ineffective assistance of counsel in this case, petitioner must establish that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on [completing the] trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). There exists "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Meeks v. Bergen,* 749 F.2d 322, 327 (6th Cir.1984).

■ This Court is required to presume state court findings of fact are correct, unless one of eight conditions is met. 28 U.S.C. § 2254(d). *Sumner v. Mata,* 449

---

**4.** No hearing is required in this case because the record and evidence before the Court is sufficiently complete to provide full review of the petitioner's claims. *Celestine v. Blackburn,* 750 F.2d 353, 358 (5th Cir.1984), *cert. denied,* 472 U.S. 1022, 105 S.Ct. 3490, 87 L.Ed.2d 624 (1985).

**5.** There are certain circumstances where a petitioner's claim of innocence would be relevant to a habeas corpus petition. See 1 James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 2.2, at 16 (1988). Such circumstances, however, are not present in this case.

U.S. 539, 546–47, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). This presumption of correctness, however, does not apply to mixed questions of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. "Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d) ... both the performance and the prejudice components are mixed questions of law and fact." *Id.* Therefore, while this Court is obligated to presume the state court's findings of fact are correct, a de novo determination is to be made as to whether those facts establish that counsel's representation was ineffective. *Adams v. Jago,* 703 F.2d 978, 980 (6th Cir.1983).

A. Failure to File Motion to Suppress.

■ Petitioner contends that he received ineffective assistance of counsel because no motion was made to suppress the preindictment photographic identification and the in-court identification of the defendant made by Ella Pittman, the only person to view the unmasked face of the perpetrator.

The first burden placed upon petitioner in advancing his ineffective assistance of counsel claim is to establish that counsel's representation fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. To do this, petitioner must show that a reasonably competent criminal lawyer would have made a motion to suppress the testimony, and that the motion would have been successful. Competent defense counsel will often raise numerous motions and objections of questionable merit, but the mere fact that other, more experienced, counsel would have made the motion to suppress does not in itself render counsel's representation deficient. A showing that the motion had merit and would probably have been granted is required. *Fornash v. Marshall,* 686 F.2d 1179, 1189–90 (6th Cir. 1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983). Since the Court believes that any reasonably competent criminal defense lawyer would have moved to suppress the identification testimony in this instance, the issue to be determined now is whether that motion would have been successful.

■ A two part test is used to determine whether the identification testimony is proper. First, the court must evaluate whether the photo array identification was unnecessarily suggestive. If the court finds suggestiveness, the second step is to determine whether, under the totality of the circumstances, the identification is nevertheless reliable. *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987). Although the underlying facts as found by the state court are to be presumed correct, "whether the factors demonstrate reliability in the identification process is a question of law for this court to decide." *Thigpen,* 804 F.2d at 896.

Ordinarily, to determine whether a photographic identification was unduly suggestive, a court would examine the photo array. However, in this instance, the photographs were not preserved. Instead, the photo pack was returned to the TBI by Agent Ray and even the defendant's picture used in the array was not shown to the defendant or the court. The Fifth Circuit has adopted the rule that when a photo array is not preserved, it is presumed to be unduly suggestive. *United States v. Sonderup,* 639 F.2d 294, 289–99 (5th Cir. Unit A Mar.1981), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 426 (1981); *Branch v. Estelle,* 631 F.2d 1229, 1234 (5th Cir.1980). This presumption has been rejected by courts in the First and Second Circuits. *Sales v. Harris,* 675 F.2d 532, 538 n. 3 (2d Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982); *Brown v. Streeter,* 649 F.Supp. 1554, 1558 (D.Mass.1986), *aff'd,* 836 F.2d 1340 (1987).

By failing to show the defendant or the court the photos, the state virtually assures that the defendant will be unable to argue

the suggestiveness of the photographs. Unless the witness or officer admits to the suggestiveness of the array, there will be no means available to contest the identification procedures. In cases such as this, where a limited number of photographs are shown to a witness, there is no burden placed upon the state by requiring the preservation of the array for later evaluation by the court.

The Court believes that the presumption formulated by the Fifth Circuit is the best means to ensure reliable identification procedures. Otherwise, the court would be obligated to substitute the opinion of law enforcement officers for its own impartial judgment regarding the suggestiveness of photo arrays. Accordingly, since the photographic array shown to Ella Pittman by Agent Ray was not preserved, it is presumed to be suggestive.

■ This, however, does not end the inquiry. Once a photo identification is found to be suggestive, the court must then determine whether, under the totality of the circumstances, the identification was reliable. The factors to consider in this regard include:

[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

Neil, 409 U.S. at 199, 93 S.Ct. at 382.

While Mrs. Pittman was struggling with the robber, she succeeded in pulling the mask off his head and viewed him for "a second or two" from a distance of one to two feet. The robber then stepped back, covered the lower part of his face with his hands, and ran off. This occurred at night in the store parking lot, but Mrs. Pittman testified that the security lights in the lot provided sufficient illumination for her to see his face "very clearly."

Shortly after the attack, she provided a description of the robber to the sheriff and Agent Ray. He was described as a white male, 5′8″ to 5′10″ in height, with a medium build, blonde or light colored hair of medium length, large blue eyes, a small pointed nose, and appearing to be between fifteen and twenty-five years of age. At the trial nine months after this description was given, Smith appeared as a thirty-six year old white male, approximately 5′10″ in height, with red or reddish-brown short hair, blue eyes, and a nose which Smith described in his objections to the Report and Recommendation as large and hawkish, "like Senator Mondale's." Smith called several witnesses who testified that his hair color had always been red, but Smith's wife reported that she had cut his hair the day after the crime occurred.

Three days after the robbery, Agent Ray of the TBI showed Mrs. Pittman an array of eight photographs, of which one was of the petitioner. At the time, Mrs. Pittman was at the hospital under medication and was shown the photos at approximately 2:00 a.m. Nevertheless, she testified that she unhesitatingly selected the photograph of the defendant after viewing the photos for one or two minutes.

Mrs. Pittman was also asked if she could identify the robber in the courtroom. She testified that, based upon her original memory of the events that took place, she had no doubt that the defendant was the robber. Since the night of the robbery, she professed that she had seen the defendant only twice—in the photo array and at a preliminary hearing.

Applying the factors expounded in Neil to these facts indicates that despite the presumption of suggestiveness, there is little likelihood of misidentification on Ella Pittman's part. She had a clear opportunity to view the criminal. She observed his face from a distance of one to two feet. Although it was at night, the parking lot security lights provided sufficient illumination. There can be no doubt that Mrs. Pittman's attention was highly focused upon her assailant's face as she struggled with him for those few seconds. Although the robber's mask was off for such a short period of time, Mrs. Pittman's testimony indicated that his appearance made an in-

delible impression on her memory. Her level of certainty could not have been higher. She testified that she chose the defendant's photo from the array without hesitation and at the trial, she expressed absolutely no doubt that the defendant was the attacker. The photo identification was made only three days after the crime and the in-court identification occurred nine months later.

The petitioner stakes his claim on the sole remaining *Neil* factor, namely, the accuracy of the witness' prior description of the criminal. Specifically, petitioner argues that his age, hair color and nose are markedly different from the description of the criminal given by Mrs. Pittman at the time of the crime.

There exists an apparently significant age difference between the petitioner, who was 36 years of age in 1982, and Mrs. Pittman's description of the robber as a young man between 15 and 25 years of age. Mrs. Pittman was 47 years old at the time and testified that to her, the defendant did seem young since he resembled her daughter's friends.

Mrs. Pittman admitted at trial that the defendant's hair color appeared darker than it did on the evening of the robbery. One theory proffered by the State to explain this apparent discrepancy is that the defendant's hair may have been lighter in color when the crime was committed and appears darker now because his hair had been cut and was shorter. Another explanation could be that the illumination produced by the parking lot security lights tends to give dark colors a lighter tint.

While petitioner asserts that his nose is large and hawkish, Mrs. Pittman testified at trial that his nose appeared slim. This again is a question of interpretation and a matter of degree. A slim nose may appear small and pointy at close range, although it may appear large and hawkish from a distance or in profile.

In any event, the discrepancy between red/brown hair and light/blonde hair and between a hawkish nose and a pointy one is not sufficiently substantial to call into question the overall reliability of Mrs. Pitt-

man's identification. Neither is the age differential. Mrs. Pittman was no expert on estimating the age of persons and she noted that to her, the defendant resembled one of her daughter's young friends. The defendant certainly did not have a clear case for the suppression of the identification testimony. At best, the motion would have been a close call, and even that would not warrant a finding of ineffective assistance of counsel. *Fornash*, 686 F.2d at 1189; *Satchell v. Cardwell*, 653 F.2d 408, 410 (9th Cir.1981). The Court finds that based upon the evidence presented at trial and at the post-conviction hearing, a motion to suppress would have been unsuccessful. Since the motion would have failed, petitioner cannot claim that but for counsel's failure to bring the motion, he would not have pleaded guilty. Therefore, petitioner's claim of ineffective assistance of counsel on this point is without merit.

### B. Failure to Investigate Medical History.

■ Petitioner's second basis for asserting ineffective assistance of counsel alleges that counsel failed to investigate petitioner's history of medical problems with his leg. As a result, he was unable to rebut the prosecution's inference that the condition of his leg was consistent with having been injured during the holdup.

Counsel has the obligation to undertake reasonable investigations to aid in the defense of his client. In this case, the robber was temporarily pinned between a truck and a jeep and would likely evidence a leg injury. Apparently, petitioner's legs appeared injured at the time of his arrest but, according to petitioner, he had a history of medical problems with his legs. If petitioner informed counsel of his medical condition, counsel would be derelict in his duty if he had not investigated this information and presented evidence to explain the defendant's leg injury.

The underlying presumption of this claim, however, is that the state put forth evidence about petitioner's leg injury and then called the inference to the jury's attention. After a review of the trial transcript, it does not appear that the State

introduced evidence of petitioner's leg injury nor did they make any inference regarding the condition of petitioner's legs. The only mention of defendant's legs came when defense counsel introduced into evidence photographs of the defendant taken by the TBI when he was arrested.[6]

Accordingly, since no mention of petitioner's leg injury was made by the State, petitioner was not prejudiced by counsel's alleged failure to conduct an investigation and petitioner cannot now claim that, but for counsel's failure to investigate, he would not have pleaded guilty. Therefore, no basis for ineffective assistance of counsel has been presented on this ground.

### C. Refusal to Permit Defendant's Testimony.

■ Petitioner's third claim, termed as one of ineffective assistance of counsel, is in fact a claim that defense counsel and the trial court violated petitioner's constitutional right to testify on his own behalf. Petitioner does not challenge counsel's advice against testifying. Considering the demeanor of the defendant, his past record, and the story he proposed to tell, counsel's strategic decision to not have the defendant testify was reasonable and did not constitute ineffective assistance of counsel.

The possibility remains, however, that the right to testify may have been violated although the right to effective assistance of counsel was not. Petitioner raises two bases for this claim. First, he asserts that counsel abridged his right by making the decision that petitioner would not testify, without regard for petitioner's desire to testify, by closing defense proof without calling the petitioner. Second, he asserts that the trial court abridged the petitioner's right to testify by refusing to allow him to take the stand simply for the "orderly administration of justice" because the defendant's desire to testify came after the state had put on its rebuttal testimony.

■ The right of a defendant to take the stand is fundamental and may only be waived by the defendant himself. *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2510 n. 1, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring); *United States v. Scott*, 909 F.2d 488, 490–91 (11th Cir. 1990); *United States v. Martinez*, 883 F.2d 750, 755 (9th Cir.1989), *vacated for other reasons*, 928 F.2d 1470, *cert. denied*, —— U.S. ——, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991). See also *Rock v. Arkansas*, 483 U.S. 44, 51–53, 107 S.Ct. 2704, 2708–10, 97 L.Ed.2d 37 (1987). At trial, defense counsel did not alert the court to defendant's wish to testify until after the defense had rested and the prosecution had all but concluded its rebuttal.[7] After hearing the defendant's proposed testimony away from the jury, the court determined that the testimony would not be appropriate in rebuttal and denied defendant the opportunity to testify. When petitioner testified before the trial court, no mention was made of defense counsel's alleged refusal to call petitioner as a witness.

At the state post-conviction hearing, the petitioner and defense counsel presented different accounts of the trial. Petitioner asserted that he consistently expressed the

---

**6.** The sum total of defense counsel's reference to petitioner's legs is as follows:

DIRECT EXAMINATION [OF AGENT RAY]
By: Mr. Peebles

. . . . .

Q: Agent Ray, you testified previously that after Jimmy Smith was arrested that he was taken to TBI headquarters Lynbar and that he was stripped and photographed, is that true?
A: Yes sir.
Q: Have you got those photographs with you?
A: I think I do.
Q: All right, could I see them please?
A: They are in my file.
Q: These three photographs have just come out of a series of photographs you've handed

me out of an envelope marked Jimmy Dale Smith and David Ray, Special Agent on the front. Are those three photographs of Jimmy Smith's legs?
A: That is correct.
Q: Would you make these an exhibit to your testimony?
A: Yes sir.
MR. PEEBLES: I guess these would be defense one
Trial TR at 185–86.

**7.** The State indicated that it needed only to introduce an exhibit into evidence before concluding its rebuttal.

desire to testify yet, despite this, counsel rested without calling him to the stand. On the other hand, Mr. Peebles testified that, although he felt the decision to put the defendant on the stand was one for the attorney to make, he stated that, "if I closed my case without him testifying, then he had agreed to that, or I would have put him up here." P–C Hearing TR at 152. At the conclusion of the hearing, the court found that there was no error present in Mr. Peebles' representation of the petitioner, nor were there any other bases for granting a new trial.

■ The issue is ultimately a question of fact—did defense counsel rest his case despite petitioner's wish to testify, or did petitioner's desire to testify come only after the defense rested? The state court obviously chose to believe Mr. Peebles version that petitioner agreed to waive his right to testify and only changed his mind upon hearing the state's rebuttal.[8] The transcript of the hearing indicates that petitioner was quite confused regarding the order of proceedings at trial.[9] Petitioner claims that he told Mr. Peebles of his decision to testify at some time during the defendant's case-in-chief or immediately after the defense rested. He stated that at

that time, Mr. Peebles informed the court of his wish to take the stand. The transcript shows, however, that the court was not informed of petitioner's decision to testify until after the state had virtually concluded its rebuttal. This, coupled with petitioner's testimony, indicates that petitioner did not decide to testify until after the defense had rested.

Petitioner relies exclusively on his memory, and admits that his recollection is markedly different from the sequence of events preserved in the trial transcript. Moreover, at the post-conviction hearing, petitioner asserted that his recollection was clear, yet also claimed that he was "out of his mind." The court made this observation:

> You [petitioner] told me here before lunch that you were in such a state from loss of sleep and taking medicine and all that sort of thing, that you just had no real comprehension of what was taking place. And now you're telling me that you remember in minute detail every word that was said and can controvert the certified record in this case.

P–C Hearing TR at 91. The state court clearly chose to discredit petitioner's assertions.

8. The court had no affirmative duty to determine whether the defendant's silence was the result of a knowing and intelligent decision not to testify. *Martinez*, 883 F.2d at 759; *Ortega v. O'Leary*, 843 F.2d 258, 261 (7th Cir.), *cert. denied*, 488 U.S. 841, 109 S.Ct. 110, 102 L.Ed.2d 85 (1988); *United States v. Systems Architects, Inc.*, 757 F.2d 373, 375–76 (1st Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985).

9. The following statements were made by the petitioner at the post-conviction hearing:

> MR. SMITH: I told him [Mr. Peebles] I wanted to testify; had to testify; intended to testify and I had no other option but to testify, and I—the last time we discussed it—I became—I did not become angry, but I became slightly irritated, and I told him, I said I'm adamant on this issue. I said I'm going to testify. He comes in here, and according to my recollection puts on three witnesses, but the ah-h,— trial transcript reflects four witnesses, and then he rests my case from across the room. By the time he gets over here to me—now *this is the way I remember it, but the trial—the trial transcripts do not reflect it like this; they've got to where I was wanting to testify way later about forty or fifty pages later in the*

> *transcript,* but in accordance with my recollections and my memory, and I believe there's people that was in the Courtroom that day that can verify what I'm saying, I wanted to testify while the defense witnesses were on the stand—I mean during the defense witness session and period, Mr. Peebles knew that and he deprived me from my testimony.

> $\cdots$

> MR. SMITH: He [Mr. Peebles] said we'll have one last recess to make a final decision on this Jimmy; and he said then we'll make a final decision whether or not you testify or not. Now I had countless numbers of pages and issues—no, I didn't have countless numbers of pages, but I had countless numbers of issues and comments and stipulations I wanted to testify about. Now there's phases in the record that substan—that verifies what I'm saying to a certain extent. Mr. Peebles comes in here, puts on two or three witness and ah-h,—according to my testi—according to my recollections now, this was all during the defense witness session. *Then he rests my case, and then I insist he tell you I wanted to testify. But now you all have got the record completely contrary to the way I remember it.*

> P–C Hearing TR at 72–73 (emphasis added).

Taking into account both Mr. Peebles' and petitioner's presentation of the facts, and according the state court's findings of fact a presumption of correctness, the Court concludes that the petitioner did not decide to testify until after hearing the state's rebuttal case. Accordingly, petitioner was not denied the right to testify by his trial counsel.

■ The remaining question is whether the trial court's decision, denying petitioner the opportunity to take the stand after the state's rebuttal case, violated petitioner's constitutional right to testify. At the end of the state's rebuttal case, defense counsel informed the court that the defendant wished to testify. Out of the presence of the jury, the court heard the defendant's proposed testimony and concluded as follows:

> [T]he Court finds in this case, and in every case, that the orderly administration of justice requires at least certain limits as to what Courts can permit. I believe the record will reveal in this case, that this case was offered, at least granted numerous recesses to decide how to proceed. That there never has been any moment in the trial that the Court has attempted to hurry defense counsel, or the Defendant. He passed up all opportunities to testify; that he now seeks to offer information into record after the State has rested in rebuttal except for the filing of an exhibit. The Court finds none of this statement to constitute any rebuttal of evidence offered in rebuttal by the State, and none of it to cover any subject not well known to be important in this trial, at the time he had his opportunity to testify. His reasons for choosing not to do so are private to him and his attorney. The Court can not permit the orderly trial of cases to be handled in this manner, and will deny the Defendant the right to offer any of this testimony before the jury.

Trial TR at 270–71.[10]

In Tennessee, the trial court has wide discretion in ruling on the introduction of

evidence in rebuttal. *Oliver v. State*, 348 S.W.2d 325, 327 (Tenn.1961); *State v. Bell*, 690 S.W.2d 879, 882 (Tenn.Crim.App.1985); *Wilson v. State*, 452 S.W.2d 355, 358 (Tenn. Crim.App.1969). Courts have often exercised this discretion in favor of the State by permitting the prosecution to introduce evidence out-of-time or to reopen its case. See, e.g., *Colbaugh v. State*, 188 Tenn. 103, 216 S.W.2d 741, 743 (1948); *Martin v. State*, 157 Tenn. 383, 8 S.W.2d 479, 480 (1928); *State v. Lingrel*, 692 S.W.2d 41, 44–45 (Tenn.Crim.App.1985); *Johnson v. State*, 4 Tenn.Cr.App. 154, 469 S.W.2d 529, 530 (1971). The fact that courts have exercised their discretion to permit the untimely introduction of evidence does not, in itself, render the trial court's decision in this case arbitrary or unjust.

The Supreme Court has recognized that when rights as fundamental as the right to testify or to present evidence on one's own behalf are involved, courts must not mechanistically apply rules of procedure and evidence when to do so would defeat the ends of justice. *Rock v. Arkansas*, 483 U.S. 44, 55–56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). However, in conducting his defense, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302, 93 S.Ct. at 1049.

In the instant case, the rules of procedure were not applied in a draconian manner and did not result in injustice. Before ruling on the defendant's request to take the stand, the court permitted the defendant to testify out of the presence of the jury. After hearing the testimony and determining that the defendant had waived his right to testify, the court refused to permit the defense to reopen its case. The defendant knew the possible importance of his testimony during his case-in-chief, and

---

**10.** The trial transcript filed with the Court is missing the relevant page numbers and so reference is made to the pages as counted by the Court.

yet chose for strategic reasons to remain silent.

 Although defendants must be given every reasonable opportunity to present their case and are afforded every reasonable doubt, they are not above the rules of the court and may not seek an advantage by waiting to testify until the close of all proof. Once a defendant knowingly, intelligently, and voluntarily waives his right to testify on his own behalf, the trial court is not obligated to permit him to testify after he has rested his case when to do so would violate established rules of evidence or procedure.

In this instance, petitioner's proposed testimony was not offered as rebuttal, but rather belonged in his case-in-chief. As such, it was untimely. Even though the trial court had the discretion to permit the testimony, it was not constitutionally obligated to do so.[11] Accordingly, petitioner's right to testify was not abridged when the trial court refused to permit his testimony at the end of the prosecution's rebuttal case.

### D. Other Factors Allegedly Rendering Guilty Plea Involuntary.

Petitioner raises a number of other grounds for relief couched under the rubric of ineffective assistance of counsel. In this section, each will be briefly addressed.

 It is claimed that counsel represented to petitioner that he could arrange an early release when, in fact, he could not. This issue was addressed in the state post-conviction hearing. Mr. Peebles testified that he made no such statement but merely told petitioner that he could arrange an agreement with the State to recommend a sixty year sentence. The state court's determination that no improper representation was made to petitioner is entitled to a presumption of correctness and the Court

finds no reason to question that court's findings.

Petitioner's claim that Mr. Peebles had been conspiring against him since the mid–1970s is devoid of factual support, and despite his alleged belief in this regard, petitioner chose to hire Mr. Peebles in 1982 to represent him. The record reflects that Mr. Peebles performed adequately in the representation of petitioner and nothing suggests a conspiracy existed except in petitioner's own mind.

 Finally, petitioner claims counsel was ineffective because he called petitioner's ex-wife as a witness. The decision to call her was based upon reasonable trial tactics and, as Mr. Peebles explained at the post-conviction hearing, she had been subpoenaed by the State, not the defense. Under the circumstances, counsel's decision to call Mrs. Meadows did not approach constitutionally deficient representation.

## II. *Other Grounds for Relief.*

### A. Competence to Plead Guilty.

 Petitioner asserts that his guilty plea was not intelligently made because he was not mentally competent at the time it was entered. He claims that he had an hallucination the night before he pled guilty and "totally lost my mind." At the post-conviction hearing he claimed a number of factors contributed to his alleged incapacity:

> MR. SMITH: That last night that I was down there in jail, I—reviewed and analyzed my health factors, and how health conscious I am, and how consciously aware I am about nutritional aspects of my life; different things such as cholesterol and low-salt diets, high fiber diets and that sort of thing. And ah-h, I recall thinking at some point that

---

**11.** Petitioner cites two cases to support his argument that a trial court should permit defendant to testify out of turn. However, petitioner mistakenly states that the district court in *Ortega v. O'Leary,* 843 F.2d 258 (7th Cir.1988) granted habeas relief on this ground. In that case, the writ was denied and the Seventh Circuit affirmed without reaching the issue. In *United States v. Walker,* 772 F.2d 1172 (5th Cir.1985),

the Fifth Circuit was reviewing a federal conviction under a standard of abuse of discretion. This Court is not part of the appellate review of state procedure and so does not consider whether the trial court abused its discretion. Under 28 U.S.C. § 2254(a), the Court reviews petitioner's case only for errors implicating constitutional or federal rights.

night, as long as I stayed down there in that jail that I was going to be eating a high-cholesterol diet; that I was going to have to eat chemical additives in food, and ah-h, lunch meats and balonga [sic] and stuff like that, I don't even eat it unless I have to, unless I have—if I have any other alternative, I don't eat. I love the taste of it, but it's for the health factors.

THE COURT: Okay, what's the point now; what are you saying that that had to do with your entering the guilty plea?

MR. SMITH: All right. That—combine that with the jail conditions—first I want to say something. I'm not making any complaint that they were not feeding an adequate calorie diet. The calories—they were feeding us a sufficient amount of calories, but it was the type of food—it would be okay food—

THE COURT: I understand that you allege that the food was not, in your opinion, healthful food, and that that's one of the reasons that you pled guilty. Now what other reasons do you have?

MR. SMITH: It's because of my health situation. I'm not supposed to eat these kind of foods. I'm not.

THE COURT: All right, what other reasons do you have?

MR. SMITH: And ah-h, I analyzed and perceived that if I stayed down there in that jail that it was creating an enormous pressure and turbulence in my system, in my mind, in my heart, and in my stomach, and my circulatory system—every aspect of my mental health, physiological health, and I couldn't get any exercise, proper type of exercise. And ah-h, it was a very restrictive environment; it was oppressive, repressive, depressive and oppressive [sic], and you combine all those factors together and you start analyzing various aspects of different ones, like I was that night, and I had been doing that for a periodic time—it—all that combined with everything else I told you combined to create an enormous pressure, and ah-h—

THE COURT: That caused you to do what?

MR. SMITH: Evidentially it caused me to loose [sic] my mind totally and irrevocably, Your Honor, because if I had not have totally lost my mind, my mental faculties, and perceivability and my capabilities of being able to analyze situations like I normally can, a person that's in a station of life, or position of life like I was in, he would not under any circumstances accept any kind of plea if he was in his right mind....

. . . . .

THE COURT: And you say that this caused you to swear to me falsely, that you committed these crimes?

. . . . .

MR. SMITH: ... I find it incredibly hard to believe and totally inconceivable that I said any of those things, but I don't think I'm in a position to deny them.... And ah-h, one other thing I need to say, Your Honor, while I'm on the subject. I had a back infection. Now this is one of my most primary concerns when I was down there in the jail; it likely to have drove me totally out of my mind for weeks....

THE COURT: Well now what effect did that have on your guilty plea?

MR. SMITH: Okay, I had read—I have been extremely and exceedingly health concerned, and health conscious every [sic] since 1969, truly. Ah-h,

THE COURT: Well are you saying that having a boil on your back would cause you to come to Court and testify falsely, or lie to me?

. . . . .

MR. SMITH: ... I had decided that it was very likely probably that it was cancer, and I was having some aches in my lung or in my heart, I don't know which. In my chest.... I was thinking I've got to get out of this jail; I've got to get some medical treatment on this.... So that, that right there combined with all these other issues I have presented before you ... they all combined and produced an unconstitutional pressure and influence which caused me to loose [sic] my mental facilities....

P–C Hearing TR at 94–100. The petitioner added at another point during the hearing that he had not slept well during the trial and that Mr. Peebles had given him pills which affected his mental capacity.

■ After hearing petitioner's claims and Mr. Peebles testimony, the court concluded that Smith was not suffering from any mental incapacity which affected his plea. However, determination as to whether a plea of guilty is voluntary is not entitled to the presumption of correctness under 28 U.S.C. § 2254(d). *Caudill v. Jago*, 747 F.2d 1046, 1050 (6th Cir.1984). Subsidiary questions of facts are entitled to the presumption, but a determination as to whether, under the totality of circumstances, the plea was voluntary and intelligent is a question of law for this Court. Cf. *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985).

A review of the trial and the post-conviction hearing transcripts indicates that petitioner failed to raise any substantial question as to his mental competence. Although he put forth an litany of factors which he claimed combined together to pressure him into entering a plea, taken together or individually they fail to establish grounds for relief. All persons on trial for serious crimes, and facing the possibility of multiple life sentences, are under enormous stress. Such pressure is not the sort which serves to render guilty pleas involuntary or unintelligent. While the petitioner showed signs of hypochondria, he failed to show that he did not understand the consequences of his plea or that his plea was not entered voluntarily. Accordingly, considering the totality of the circumstances, the Court finds that petitioner was competent to enter a plea of guilty.

### B. Other Grounds.

■ The three remaining assertions of error alleged by petitioner may be quickly resolved. First, he asserts that his plea was defective since he was not informed of the collateral consequences of his plea. However, the trial transcript indicates that he was informed by the judge of the consequences of his plea. Second, he claims that the transcripts of the trial and the post-

conviction hearing have been altered. He offers no proof except for the fact that he remembers the events differently. It is odd that he claims to have lost his mind during the trial, yet alleges that his memory of the trial is more precise than the recorded transcript. Such a bald assertion is insufficient to state a claim. Third, he asserts that the introduction into evidence of the gun found at the crime was improper insofar as it was not his gun, and thus he alleges that by its introduction the State presented false evidence. While it is true that the serial number on the gun was different from the number handwritten on petitioner's bill of sale, the government established beyond a doubt that the serial number recorded on Mr. Smith's bill of sale was in error and that the gun found at the scene of the crime was, in fact, the petitioner's. Thus, no false evidence was introduced and the gun was properly admitted into evidence. Finally, Smith asserts that the length of time it took for the state to address his claims on post-conviction review violated his constitutional rights. This claim, however, is not cognizable under 28 U.S.C. § 2254 since it does not allege that he is in custody in violation of the Constitution or federal law.

### CONCLUSION

Petitioner was not forced to plead guilty to his crimes because of ineffective assistance of counsel or coercion. Rather, it seems the reason for his plea was that upon hearing the overwhelming evidence of his guilt adduced at trial, he believed a sixty year sentence under a plea bargain was better than the life sentence he faced upon conviction.

Finding that petitioner's grounds for relief are meritless, the Court denies the petition for the writ of habeas corpus. An Order consistent with the reasoning herein will be contemporaneously filed.