**Vernard MILES, Jr., Petitioner–
Appellant,**

v.

**Donald A. DORSEY, Warden; Attorney
General of the State of New Mexico,
Respondents–Appellees.**

No. 94–2055.

United States Court of Appeals,
Tenth Circuit.

Aug. 1, 1995.

Teresa E. Storch, Asst. Federal Public Defender, Albuquerque, NM, for petitioner-appellant.

William McEuen, Asst. Atty. Gen., (Tom Udall, Atty. Gen., with him on the brief), State of N.M., Santa Fe, NM, for respondents-appellees.

Before BALDOCK, SETH, and KELLY, Circuit Judges.

BALDOCK, Circuit Judge.

Petitioner Vernard Miles, Jr., appeals the district court's order dismissing with prejudice his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Petitioner seeks review of a state judgment of conviction entered on his no contest plea to one count of murder and two counts of first degree criminal sexual penetration, arguing that his plea was involuntary, he was incompetent to plea, and that he was denied effective assistance of counsel. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

The extensive record before us reveals the following facts. On August 17, 1989, Petitioner was charged in an amended criminal information in Otero County, New Mexico district court with thirty-three felony counts.[1] The information alleged Petitioner committed a series of increasingly violent offenses between February 1986 and February 1989, including the abduction and attempted rape of a convenience store clerk, the abduction and rape of a second convenience store clerk, and the abduction, rape, and murder of a third convenience store clerk. Petitioner's mother, father, brother, two sisters, and sister-in-law were charged with multiple offenses arising from their attempts to hide or destroy evidence that would have potentially inculpated Petitioner in the crimes.

The New Mexico Office of the Public Defender designated Gary Mitchell, a highly experienced private criminal defense attorney,[2] to represent Petitioner. Mitchell and his investigator met with Petitioner in county jail to discuss his representation of Petitioner. Mitchell admonished Petitioner that he should not discuss the case with anyone, including Mitchell, until Mitchell had collected police reports, witness statements, and completely reviewed all details of the case. Petitioner, however, confessed to Mitchell that he had committed the crimes with which he was charged. Later, Petitioner made inculpatory statements concerning his involvement in the crimes to others.

After his confession to Mitchell, Petitioner denied involvement in the crimes and indicated that his family could provide alibi testimony. Mitchell arranged for a polygraph examiner to examine his client. The results showed that Petitioner gave deceptive answers relating to his involvement in the homicide of the convenience store clerk.

Mitchell learned the following facts about Petitioner's mental capacity in his investigation. Petitioner speaks, reads, and writes English. Petitioner's early school records show that he performed academically in the bottom eight percent of students his age and has a full-scale IQ of seventy-one. Although

---

1. The information included one count of capital murder, five counts of first degree rape, three counts of criminal sexual contact, eight counts of conspiracy, three counts of kidnapping, two counts of evidence tampering, four counts of assault, two counts of criminal solicitation, one aggravated battery count, one aggravated burglary count, one robbery count, a third degree larceny count, and one count of arson.

2. Mitchell has represented defendants in approximately fifty death penalty cases.

Petitioner completed only eight years of school, he passed the General Equivalency Diploma examination and earned his G.E.D., scoring highest in the reading and comprehension sub-tests. Past psychological evaluations diagnosed Petitioner with attention deficit disorder, depression, and antisocial personality disorders. Additionally, Petitioner has a history of substance abuse and behavioral difficulties.

In order to determine whether he should pursue a competency or insanity defense on behalf of Petitioner, Mitchell reviewed two prior psychological evaluations of his client and spoke with one of the evaluators. The evaluations documented evidence of intentional malingering and misrepresentation by Petitioner, and concluded that although he had a low IQ, he was not mentally retarded, psychotic, or suffering from any gross brain disfunction. In sum, the evaluations indicated that Petitioner was neither legally insane nor incompetent to stand trial.

Mitchell anticipated problems advancing an incompetency or insanity defense when prior evaluations had concluded Petitioner was competent, sane, not mentally retarded, and documented intentional malingering and misrepresentation. Mitchell also believed other factors indicated Petitioner's competence, including his attainment of a G.E.D. and a driver's license, and employment as an emergency medical dispatcher. Because the prior findings of competency and intentional malingering could jeopardize an incompetency or insanity defense, and adversely effect the sentencing phase of a trial, Mitchell decided not to pursue an incompetency or insanity defense.

The state intended to try Petitioner's family members first for their efforts to conceal or destroy evidence of Petitioner's alleged offenses, thereby eliminating them as potentially helpful witnesses to Petitioner. In all, the state indicted Petitioner's brother James Miles, two sisters, sister-in-law, and mother and father. After James Miles was convicted of conspiracy and tampering with evidence and sentenced to four and one-half years imprisonment, the trial of Petitioner's mother and father ended in a mistrial when his

mother collapsed during the trial. A retrial was scheduled for Monday, January 29, 1990.

Prior to the retrial of Petitioner's mother and father, the state proposed a new plea and disposition agreement whereby Petitioner would plead no contest to one count of murder and two counts of first degree criminal sexual penetration. In exchange, the state agreed to drop thirty of the thirty-three felony charges against Petitioner, and ensure that his family would serve no jail time for their concealment of his offenses. The state agreed to allow Petitioner's parents to plead no contest and serve probation on a conspiracy charge filed against them, dismiss criminal charges against his sisters and sister-in-law, and release his brother James Miles from prison. Petitioner, however, had to accept the plea agreement by Friday, January 26, 1990. Based on his determination that the state had an extremely strong case and that his client faced conviction on all counts, Mitchell recommended to his client that the plea agreement was in his best interest.

On Thursday, January 25, 1990, four days before the scheduled retrial of Petitioner's mother and father, New Mexico State District Judge Sandra A. Grisham[3] held a conference in her chambers with Petitioner's family, their individual counsel, Mitchell, and the prosecutors. Petitioner was not present. Mitchell and the prosecutors told Petitioner's mother, father, and sisters that the plea agreement was in Petitioner's best interest. Judge Grisham assured Petitioner's family that the state would abide by the plea agreement if Petitioner pled no contest, and that the family would receive the benefits offered under the agreement. Judge Grisham arranged for the family to discuss the proposed plea agreement with Petitioner in jail outside visiting hours that evening and the following morning. Family members met with Petitioner, told him the plea agreement was in his best interest, and that he would save his family from going to prison if he pled no contest to the charges.

On Friday afternoon, January 26, 1990, Judge Grisham arranged for Petitioner to meet with his family in the jury room of the

---

**3.** Judge Grisham was to preside over the trials of all family members, including Petitioner.

courthouse to discuss the proposed plea agreement in private. At a hearing later that afternoon, Petitioner pled no contest to one count of murder and two counts of first degree criminal sexual penetration. During the hearing, Petitioner acknowledged that: (1) he understood the nature of the charges; (2) he understood and agreed to the terms of the plea and disposition agreement; (3) no one had threatened or coerced him to enter the plea agreement; (4) no one had made him any promises that were not set forth in the agreement itself; (5) he was not presently being treated for mental illness; and (6) he was not under the influence of narcotics, alcohol, or medication that might effect his competency. Judge Grisham accepted the plea and disposition agreement. After Mitchell reviewed the document with him a final time, Petitioner signed the plea and disposition agreement. The plea agreement did not mention the benefits to Petitioner's family. Judge Grisham found Petitioner guilty of committing murder and two counts of first degree criminal sexual penetration, and sentenced him to life plus two consecutive eighteen year sentences.[4]

On May 15, 1991, Petitioner filed a petition for a writ of habeas corpus in the Otero County, New Mexico district court. The state district court dismissed the petition without opinion, and the New Mexico Supreme Court denied his petition for certiorari on December 30, 1991.

Having presented his claims to the state courts, Petitioner filed the instant petition for a writ of habeas corpus with the district court pursuant to 28 U.S.C. § 2254 on January 9, 1992. Petitioner contended that his plea was involuntary, he was incompetent to plea, and that he was denied effective assistance of counsel. The district court referred the matter to a magistrate judge who scheduled an evidentiary hearing that lasted three days.

On November 16, 1993, the magistrate judge proposed 102 findings and recommended that the district court dismiss the petition for a writ of habeas corpus. Petitioner filed objections to the magistrate judge's findings. On January 14, 1994, the district court amended[5] and adopted the magistrate judge's proposed findings and recommended disposition, and ruled that Petitioner's plea was voluntary, he was competent to plea, and that he was not denied effective assistance of counsel. Thus, the district court dismissed with prejudice Petitioner's petition for a writ of habeas corpus. This appeal followed.

On appeal, Petitioner argues the district court erred in dismissing his petition for a writ of habeas corpus because: (1) his plea was involuntary; (2) he was incompetent to plea; and (3) he was denied effective assistance of counsel. We address Petitioner's contentions in turn.

I.

Petitioner maintains the district court erred in finding that his plea was voluntary. Specifically, Petitioner argues that his plea was involuntary because: (1) Judge Grisham participated in the plea discussions; (2) his family received benefits under the plea agreement; and (3) the totality of the circumstances establish that his plea was involuntary.

"Whether a plea is voluntary is a question of federal law subject to de novo review." *Laycock v. State of New Mexico,* 880 F.2d 1184, 1186 (10th Cir.1989). We accept the district court's findings of fact unless they are clearly erroneous. *Id.* "A reviewing federal court may set aside a state court guilty plea only for failure to satisfy due process...." *Stano v. Dugger,* 921 F.2d 1125, 1141 (11th Cir.), *cert. denied,* 502 U.S. 835, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991). "The general voluntary-intelligent standard for plea taking is rooted in the due process clauses of the Constitution and is therefore

---

4. Following Petitioner's conviction and sentence, his parents pled no contest to conspiracy, and received eighteen months of unsupervised probation. The state released James Miles from prison, and dismissed the charges against his sisters and sister-in-law.

5. The district court amended thirteen of the magistrate judge's 102 findings.

applicable in both state and federal courts." *Frank v. Blackburn,* 646 F.2d 873, 882 (5th Cir.1980) (en banc), *modified,* 646 F.2d 902 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981); *see also Gaddy v. Linahan,* 780 F.2d 935, 943 (11th Cir.1986) ("The fourteenth amendment due process clause requires that a plea of guilty be knowingly and voluntarily entered because it involves a waiver of a number of the defendant's constitutional rights."). We will uphold a state court guilty plea on federal review if the circumstances demonstrate that the defendant understood the nature and the consequences of the charges against him and that the defendant voluntarily chose to plead guilty. *Boykin v. Alabama,* 395 U.S. 238, 242–44, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969); *Frank,* 646 F.2d at 882; *Stano,* 921 F.2d at 1141.

### A.

Petitioner first contends his plea was involuntary because Judge Grisham participated in the plea discussions on January 25, 1990 that culminated in his no contest plea the following day. At the evidentiary hearing, Petitioner and Respondent introduced testimony regarding Judge Grisham's involvement in the plea discussions. Petitioner's family members testified that Judge Grisham abused her position as a judge, improperly interjected herself into the plea discussions, and threatened them with long prison sentences in their upcoming trials if they did not force Petitioner to enter a plea. In contrast, Mitchell testified that Judge Grisham provided a neutral forum for the family and counsel of record to discuss the proposed plea agreement, and as a courtesy, arranged for the family to meet with Petitioner to discuss the proposed plea agreement outside scheduled jail visiting hours. Mitchell also testified that the family members met with Judge

Grisham because they did not trust the prosecutors and wanted assurances that they would actually receive the collateral benefits under the plea agreement if Petitioner pled no contest.

The district court rejected the testimony of Petitioner's family members as biased and incredible regarding Judge Grisham's actions during the plea discussions. The district court found that based on credible testimony Judge Grisham did not exert improper influence on Petitioner or his family, but merely "facilitated" the parties' plea discussion. Thus, the district court found that Petitioner's plea was not the product of force, coercion, or threats made by Judge Grisham during the plea discussions.

On appeal, Petitioner maintains that Judge Grisham unconstitutionally participated in the plea negotiations by organizing a meeting in her chambers to discuss the proposed plea agreement, assuring the family members that they would receive the collateral benefits under the plea, and by making special arrangements for family to meet with Petitioner outside of jail visiting hours. Petitioner argues that by cooperating in the plea negotiation process Judge Grisham "vigorously pressed for [his] no contest plea" and thus rendered the resulting plea involuntary as a matter of law.

Petitioner directs us to authority ruling that Fed.R.Crim.P. 11(e)(1)[6] prohibits participation of federal judges in plea discussions.[7] Petitioner argues that regardless of whether "the judge's participation is characterized as 'facilitating' or 'bludgeoning' a plea ... the judge's actions ... assisted the plea agreement in an unconstitutionally coercive manner." Aplt's Reply Br. at 2. Petitioner's argument, however, overlooks the significance of our federal habeas review of this plea bargain entered in state court. While

---

6. "The court shall not participate in any such discussions." Fed.R.Crim.P. 11(e)(1).

7. *E.g., United States v. Corbitt,* 996 F.2d 1132, 1135 (11th Cir.1993) ("Judicial participation [in plea discussions in federal court] is plain error, and the defendant need not show actual prejudice."); *United States v. Barrett,* 982 F.2d 193, 195–96 (6th Cir.1992) (defendant allowed to withdraw plea where federal judge "facilitated"

plea discussions in violation of Fed.R.Crim.P. 11(e)(1)); *United States v. Bruce,* 976 F.2d 552, 558 (9th Cir.1992) (" '[A] defendant who has pled guilty after the judge has participated in plea discussions should be allowed to replead, without having to show that actual prejudice has resulted from the participation.' ") (quoting *United States v. Adams,* 634 F.2d 830, 839 (5th Cir. 1981)).

the cases Petitioner cite leave little doubt that federal judges should not participate in plea discussions, "Rule 11 only sets the standard for federal courts; it does not necessarily establish a constitutional prohibition [applicable in state courts]." *Frank*, 646 F.2d at 882; *accord Stewart v. Peters*, 958 F.2d 1379, 1384 (7th Cir.) ("The Constitution does not enact Rule 11 of the Federal Rules of Criminal Procedure...."), *cert. denied*, ── U.S. ──, 113 S.Ct. 239, 121 L.Ed.2d 173 (1992); *Stano*, 921 F.2d at 1141; *Damiano v. Gaughan*, 770 F.2d 1, 2 (1st Cir.1985); *Toler v. Wyrick*, 563 F.2d 372, 374 (8th Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1455, 55 L.Ed.2d 498 (1978); *see also* 1 Charles A. Wright, *Federal Practice and Procedure* § 175.1, at 639 (1982) ("[Rule 11] is not necessarily a constitutional inhibition [on judicial participation in plea discussions] and the rule itself has no effect on state judges."). An absolute prohibition on participation by a federal judge in plea discussions does not establish that state district Judge Grisham's participation in the plea discussions in the instant case rendered Petitioner's plea involuntary as a matter of law. *See Frank*, 646 F.2d at 882 ("The federal rule ... offers little guidance in determining when a guilty plea entered in state court must be set aside.").

We review the validity of this state court plea bargain only to determine if Petitioner's federal constitutional rights were violated. *Id.; see also* 28 U.S.C. § 2554; *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 479–80, 116 L.Ed.2d 385 (1991).[8] The only constitutionally-based determinant of the validity of a state plea is the due process clause of the federal constitution. *Damiano*, 770 F.2d at 2; *Frank*, 646 F.2d at 882. Consequently, we will "set aside a state court plea bargain if persuaded that the trial judge's participation denied the defendant due process of law by causing him not to understand the nature of the charges against him or the consequences of the guilty plea, or if the judge's participation coerced the defendant to enter into a plea bargain involuntarily." *Damiano v. Gaughan*, 592 F.Supp. 1222, 1225 (D.Mass.1984), *aff'd*, 770 F.2d 1 (1st Cir.1985); *accord Frank*, 646 F.2d at 882; *Toler*, 563 F.2d at 374.

■ With these principles in mind, we conclude that Judge Grisham's involvement in the plea discussions in the instant case did not coerce Petitioner to plead involuntarily. Judge Grisham held a meeting in her chambers for the prosecutors, defense counsel, and Petitioner's family to discuss the proposed plea agreement. In response to their concerns, Judge Grisham assured family members that they would receive the benefits offered under the plea agreement if Petitioner pled no contest. Finally, Judge Grisham arranged for family members to meet with Petitioner to discuss the proposed plea agreement outside of usual jail visiting hours. The district court made a credibility finding based on testimony and determined that Judge Grisham did not compel family members to force Petitioner to enter a plea, nor did Judge Grisham force Petitioner to plea no contest. Based on our review of the record, the district court's conclusion that Judge Grisham facilitated the plea discussion without forcing, compelling, or coercing Petitioner's plea is not clearly erroneous. Because "[t]he constitution does not forbid the moderate type of participation shown here in plea negotiations by state trial judges," *Damiano*, 770 F.2d at 2, we hold that Judge Grisham's involvement in the plea discussion did not coerce Petitioner to plead no contest involuntarily.

8. Thus, Petitioner's reliance on N.M.R.Crim.P. 5–304 is misplaced in the context of our federal habeas review of a state plea. *See Stewart*, 958 F.2d at 1384–85 (recognizing that alleged error under Illinois counterpart to Rule 11 does not provide basis for federal habeas review). N.M.R.Crim.P. 5–304 governs plea bargaining procedure in state district courts and is based on Fed.R.Crim.P. 11(e). *See* N.M.S.C.R.A. § 5–304 commentary. Paragraph A of 5–304 prohibits judicial involvement in plea bargaining discus-sions. *See* N.M.S.C.R.A. § 5–304(A) ("The court shall not participate in any such discussions."). Although New Mexico state law prohibits state district judges from participating in plea discussions, as a New Mexico state statute, Rule 5–304(A) does not constitute a federal constitutional right suitable for federal habeas review. *See* 28 U.S.C. § 2254; *Estelle*, 502 U.S. at 68 n. 2, 112 S.Ct. at 480 n. 2 ("[S]tate-law violations provide no basis for federal habeas relief.").

## B.

Petitioner next contends his no contest plea was involuntary because his family received benefits under the plea agreement. Specifically, Petitioner argues his plea was involuntary because: (1) the prosecutors threatened to imprison his family unless he pled, and (2) his family urged him to plea so they would not have to go to prison.

■ "The Supreme Court has specifically reserved judgment on 'the constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person *other* than the accused.'" *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C.Cir.) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 668 n. 8, 54 L.Ed.2d 604 (1978)), *cert. denied,* —— U.S. ——, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992). Because "[a]lmost anything lawfully within the power of a prosecutor acting in good faith can be offered in exchange for a guilty plea," *id.* at 1021, we have ruled that a plea is not per se involuntary if entered under a plea agreement that includes leniency for a third party. *Mosier v. Murphy*, 790 F.2d 62, 66 (10th Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 582, 93 L.Ed.2d 584 (1986); *accord United States v. Marquez*, 909 F.2d 738, 741 (2d Cir.1990) (citing cases from the First, Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *Pollard*, 959 F.2d at 1021. Instead, a third party benefit in a plea agreement presents "a factor for the court to consider when evaluating the voluntariness of the defendant's plea." *United States v. Whalen*, 976 F.2d 1346, 1348 (10th Cir.1992); *accord Marquez*, 909 F.2d at 742. "[B]ecause such bargaining 'can pose a danger of coercion' and 'increase the leverage possessed by prosecutors,' the government must abide by 'a high standard of good faith' in its use of such tactics." *United States v. Wright*, 43 F.3d 491, 498

(10th Cir.1994) (quoting *Mosier*, 790 F.2d at 66).

■ The government acts in good faith when it offers leniency for an indicted third party or threatens to prosecute an unindicted third party in exchange for a defendant's plea when the government has probable cause to prosecute the third party. *See Politte v. United States*, 852 F.2d 924, 930 (7th Cir.1988) ("We hold that a good faith prosecution of a third party, coupled with a plea agreement which provides for a ... lenient sentence for that third party, cannot form the basis of a claim of coercion by a defendant seeking to show that a plea was involuntarily made."); *Wright*, 43 F.3d at 499 ("To lawfully threaten third persons with prosecution during the course of plea negotiations, the government must have probable cause that those third persons committed the crime that the government threatens to charge."); *Pollard*, 959 F.2d at 1021.[9] Consequently, so long as the government has prosecuted or threatened to prosecute a defendant's relative in good faith, the defendant's plea, entered to obtain leniency for the relative, is not involuntary. *See Mosier*, 790 F.2d at 66 (plea offered by man to protect his validly indicted wife and mother-in-law from prosecution held not involuntary); *Marquez*, 909 F.2d at 741–42 (plea entered by man to protect his wife from prosecution held not involuntary); *LoConte v. Dugger*, 847 F.2d 745, 752–53 (11th Cir.) (same), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988).

■ In the instant case, Petitioner does not argue that the government lacked probable cause to charge his family with offenses relating to their concealment of evidence of his alleged crimes. Instead, Petitioner contends that his plea was involuntary as a matter of law because the prosecutors threatened to imprison his family unless he pled no contest. Petitioner maintains that the gov-

---

9. The probable cause requirement for third party benefits in plea discussions does not prevent the government from offering to halt a good faith criminal investigation of a third party in exchange for a defendant's plea. *Wright*, 43 F.3d at 499 n. 4. If an investigation of a third party has not yet produced sufficient evidence to yield probable cause, the prosecution could still offer to cease that investigation in exchange for the defendant's plea. "In such a case, the prosecution is acting 'with a high degree of good faith' because it is not claiming to be capable of doing more than the law permits ... *i.e.,* threatening to indict third persons when it does not have probable cause with which to do so." *Id.*

ernment's threats unconstitutionally coerced him to plead involuntarily in order to protect his family from prosecution and prison. We disagree.

Our review of the record indicates the prosecutors acted in good faith. A grand jury indicted Petitioner's mother, father, brother, two sisters, and sister-in-law. "When a grand jury indictment has been returned against any defendant, there is a strong presumption that the charge is brought in good faith." *Politte*, 852 F.2d at 929. Further, a jury convicted Petitioner's brother James Miles of tampering with evidence of Petitioner's alleged crimes and the state district court sentenced him to four and one-half years imprisonment. Petitioner's mother and father pled no contest and were convicted on a conspiracy charge relating to their concealment of evidence of Petitioner's alleged crimes. In a subsequent civil suit Petitioner's sister filed against the police, the U.S. District Court for the District of New Mexico concluded that the police had probable cause to charge her for concealing evidence of Petitioner's alleged crimes.

Once the government had probable cause to prosecute Petitioner's family members and obtained valid indictments, it was entitled to prosecute them fully or offer them lenience in exchange for Petitioner's no contest plea. *E.g., Pollard*, 959 F.2d at 1021. By threatening to prosecute Petitioner's family and imprison them if found guilty unless Petitioner pled no contest, the government was merely threatening to follow through with what it was legally authorized to do. *See Wright*, 43 F.3d at 499 & n. 4; *Pollard*, 959 F.2d at 1021; *Politte*, 852 F.2d at 930. The government was not prosecuting or threatening to prosecute Petitioner's family members without probable cause.

We therefore reject Petitioner's claim that his plea was involuntary because he pled to protect his family from prosecution and imprisonment. In the absence of facts demonstrating that the government prosecuted his family without probable cause in an attempt to gain leverage over Petitioner, the fact that he entered his plea out of a desire to protect his validly indicted family from further prosecution, does not render an otherwise voluntary plea involuntary. *See Mosier*, 790 F.2d at 66 (defendant's guilty plea entered to protect his wife and mother-in-law from prosecution for murder held voluntary because "we must respect the defendant's choice and '[i]f [an accused] elects to sacrifice himself for such motives, that is his choice.'") (quoting *Kent v. United States*, 272 F.2d 795, 798 (1st Cir.1959)); *Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir.1988) (threat to prosecute validly indicted pregnant woman did not unconstitutionally coerce her husband to plea); *United States v. Diaz*, 733 F.2d 371, 375 (5th Cir.1984) ("[Defendant's] pleas would not be involuntary by reason of his desire to extricate his relatives from such a possible good faith prosecution."). Consequently, because it offered leniency to Petitioner's family in a good faith exchange for his plea, the government's offer to release Petitioner's brother from prison, enter a plea agreement with his mother and father, and dismiss charges filed against his two sisters and sister-in-law did not render Petitioner's plea involuntary.

■ We also reject Petitioner's claim that his plea was involuntary because his family urged him to plead so that they would not have to go to prison. The district court determined after hearing testimony that although Petitioner's family urged him to enter the plea, they did not force, threaten, or coerce him to do so. Neither our review of the record nor Petitioner's arguments on appeal have persuaded us that the district court's finding is clearly erroneous. The fact that his family urged him to plead so that they would receive the leniency offered under the plea agreement does not lead to the conclusion that Petitioner's no contest plea was involuntary. *See United States v. Pellerito*, 878 F.2d 1535, 1541 (1st Cir.1989) (guilty plea not involuntary where defendant's hospitalized mother urged him to plea because "the family has suffered too much"); *Stano*, 921 F.2d at 1142 ("Unavoidable influence or pressure from sources such as codefendants, friends or family does not make a plea involuntary...."); *LoConte*, 847 F.2d at 753 (guilty plea not involuntary where codefendant urged defendant to enter plea); *Iaea v. Sunn*, 800 F.2d 861, 867 (9th Cir.

1986) (strong urging by third parties to plead guilty did not render plea involuntary). We also note that Petitioner's family's urgings do not implicate the due process clause of the Fourteenth Amendment because the influence did not come from the court or the government. *See LoConte,* 847 F.2d at 753 ("It is only where the plea is coerced by conduct fairly attributable to the state that the due process clause of the Fourteenth Amendment is offended."); *see also Iaea,* 800 F.2d at 867 ("Acts that might constitute coercion if done by the court or a prosecutor may not rise to that level if done by others."); *United States ex rel. Brown v. LaVallee,* 424 F.2d 457, 460–61 (2d Cir.1970) (statements that may have been coercive from government or court held not coercive when made by defendant's mother and attorney), *cert. denied,* 401 U.S. 942, 91 S.Ct. 946, 28 L.Ed.2d 223 (1971). Thus, we conclude that the district court was not clearly erroneous in finding that the pressure his family exerted upon Petitioner to accept the plea agreement did not coerce him to plead involuntarily.

### C.

Finally, Petitioner argues that numerous factors rendered his no contest plea involuntary under the totality of the circumstances. Specifically, Petitioner maintains his plea was involuntary because: (1) Mitchell urged him to plead no contest; (2) he experienced time pressure, stress, depression, and mental anguish during the plea discussions; (3) he did not receive any benefits under the agreement; and (4) Judge Grisham did not ensure at the plea hearing that his plea was voluntary.[10] We address Petitioner's contentions seriatim.

### 1.

■■■ Petitioner argues Mitchell vigorously urged him to plead no contest, thereby coercing his involuntary plea. The district court judge determined that although Mitchell advised Petitioner that the proposed plea agreement was in his best interest, Mitchell did not force or unconstitutionally coerce Petitioner to plea no contest. Petitioner has failed to demonstrate that the district court's finding in this regard is clearly erroneous. Merely because Mitchell attempted to persuade Petitioner that it was in his best interest to plea does not lead to the conclusion that his no contest plea was involuntary. *See Williams v. Chrans,* 945 F.2d 926, 933 (7th Cir.1991) (" 'Advice—even strong urging' by counsel does not invalidate a guilty plea.") (quoting *Lunz v. Henderson,* 533 F.2d 1322, 1327 (2d Cir.), *cert. denied,* 429 U.S. 849, 97 S.Ct. 136, 50 L.Ed.2d 122 (1976)), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Uresti v. Lynaugh,* 821 F.2d 1099, 1102 (5th Cir.1987) (attorney's threat to withdraw from case if client did not accept plea bargain was insufficient to establish that plea was involuntary). Consequently, we reject Petitioner's claim that his plea was unconstitutionally coerced because Mitchell advised him to accept the proposed plea agreement.

### 2.

■■■ Petitioner argues the time pressure, stress, mental anguish, and depression he experienced during the plea discussions rendered his no contest plea involuntary. Petitioner contends that the imminence of the Friday, January 26, 1990 deadline and his mental anguish, depression, and stress resulted in an involuntary plea. We disagree. Although deadlines, mental anguish, depression, and stress are inevitable hallmarks of pretrial plea discussions, such factors considered individually or in aggregate do not establish that Petitioner's plea was involuntary. *See Pellerito,* 878 F.2d at 1541 (ruling that although "[c]riminal prosecutions are stressful experiences for nearly all concerned," the

---

10. Petitioner also contends his no contest plea was involuntary under the totality of the circumstances because he is of low intelligence, Judge Grisham participated in the plea discussions, and his family urged him to plea. We do not address Petitioner's contention that his low intelligence rendered his plea involuntary under the totality of the circumstances because we have concluded that he was legally competent to plead no contest. *See infra* part II. We do not revisit Petitioner's allegations regarding judicial participation and familial influence because we have determined that neither Judge Grisham's involvement in the plea discussions nor Petitioner's family's entreaties coerced Petitioner to plea involuntarily. *See supra* part I.A–B.

defendant's "agitated emotional state" did not establish that his guilty plea was involuntary); *Smith v. Campbell,* 781 F.Supp. 521, 535 (M.D.Tenn.1991) ("All persons on trial for serious crimes, and facing the possibility of multiple life sentences, are under enormous stress. Such pressure is not the sort which serves to render guilty pleas involuntary or unintelligent."), *aff'd,* 961 F.2d 1578, 1992 WL 97958 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 423, 121 L.Ed.2d 345 (1992). Consequently, we reject Petitioner's assertion that the plea deadline and his mental state rendered his no contest plea involuntary.

### 3.

■ Petitioner next maintains that his plea was involuntary because he did not receive any benefits under the plea agreement but was ensured only that he would spend the rest of his life in prison. We find Petitioner's contention on this point disturbing because his argument appears to intentionally ignore the facts of the plea agreement. The government charged Petitioner with thirty-three felony counts, thirty of which were dismissed pursuant to the plea agreement when Petitioner pled no contest to one count of murder and two counts of first degree criminal sexual penetration. The no contest plea reduced a potential sentence of approximately 240 years to one which could permit Petitioner to spend the final years of his life outside prison. Further, Petitioner obtained significant leniency for his family with his plea. We therefore reject Petitioner's assertion that he did not receive any benefits under the plea agreement because it is contrary to the facts.

### 4.

■ Petitioner also contends his no contest plea was involuntary because Judge Grisham failed to ensure that his plea was voluntary at the plea hearing. Specifically,

Petitioner maintains that settled precedent required Judge Grisham to conduct a full inquiry into the third party benefits in the plea agreement to ensure that his no contest plea was truly knowing and voluntary. Petitioner directs us to authority construing Fed. R.Crim.P. 11 which governs plea hearings in federal court.[11] Again, Petitioner's argument overlooks the significance of our federal habeas review of this state court plea bargain. We remind counsel that as a reviewing federal court we do not test the constitutional adequacy of a state plea hearing against the myriad procedures mandated by Rule 11. *E.g., Stewart,* 958 F.2d at 1384 ("The Constitution does not enact Rule 11...."); *Frank,* 646 F.2d at 882. Instead, on federal habeas review we determine the adequacy of a state court plea hearing under the due process clause of the Fourteenth Amendment by inquiring whether the defendant entered the plea "voluntarily and with a complete understanding of the nature of the charge and the consequences of his plea." *Frank,* 646 F.2d at 882; *see also Boykin,* 395 U.S. at 243–44, 89 S.Ct. at 1712–13.

■ Our review of the audiotape record of the plea hearing in the instant case indicates that before Judge Grisham accepted Petitioner's no contest plea, she established that his plea was voluntary and entered with a complete understanding of the charges and the consequences of the plea. Specifically, Judge Grisham conducted a constitutionally adequate inquiry by determining that: (1) Petitioner understood the nature of the charges, the terms of the plea agreement, and the consequences of his plea; (2) Petitioner understood that he was waiving his right to a jury trial and right to confront witnesses; (3) no one had threatened or coerced Petitioner to enter the plea agreement; and (4) Petitioner was not then being treated for mental illness, nor was he under the influence of medication that might affect his competency. Because the record reveals

11. *See, e.g., United States v. Caro,* 997 F.2d 657, 659–60 (9th Cir.1993) ("We make it clear today that, in describing a plea agreement under Rule 11(e)(2), the prosecutor must alert the district court to the fact that codefendants are entering a package deal."); *Whalen,* 976 F.2d at 1348 (noting that third party benefits in a plea agreement presents a factor for federal district court to consider when evaluating the voluntariness of a defendant's plea at the Rule 11 hearing); *United States v. Blackner,* 721 F.2d 703, 708–09 (10th Cir.1983) (violation of Rule 11 disclosure requirement mandated that court allow defendant to withdraw plea).

that Judge Grisham undertook a constitutionally sufficient inquiry to ensure the voluntariness of Petitioner's no contest plea, *see Boykin,* 395 U.S. at 244, 89 S.Ct. at 1712–13, we reject Petitioner's argument that his plea was involuntary because Judge Grisham failed to inquire into the third party benefits of the plea agreement.

In sum, we conclude that the litany of factors raised by Petitioner in support of his argument do not establish, either individually or in aggregate, that his no contest plea was involuntary under the totality of the circumstances. Rather, we find that the district court did not err in concluding that his plea was knowing and voluntary when entered.

## II.

Petitioner next contends the district court erred in concluding that he was competent to plea. Specifically, Petitioner maintains he was incompetent because: (1) Dr. Alexander testified at the evidentiary hearing that Petitioner was mentally retarded and legally incompetent to plea, and (2) he is borderline mentally retarded, has a history of mental illness, and has been prescribed psychotropic medication and abused drugs and alcohol. Because he was incompetent to plea, Petitioner argues that we should grant his habeas petition and vacate his convictions.

■■■■■ The "conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). "[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran,* ── U.S. ──, ──, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960)); *see also Wolf v. United States,* 430 F.2d 443, 444 (10th Cir.1970); 18 U.S.C. § 4241 (competency standard in fed-

eral prosecutions).[12] "The presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to knowingly and voluntarily enter a plea as well as aid and assist in his own defense." *Wolf,* 430 F.2d at 444. "In a federal habeas proceeding stemming from a state court conviction, the burden is on the petitioner to prove, by a preponderance of the evidence, that he was incompetent in fact at the time of the plea." *Bouchillon v. Collins,* 907 F.2d 589, 592 (5th Cir.1990); *see also Beeler v. Crouse,* 332 F.2d 783, 783 (10th Cir.1964) ("Habeas corpus is a civil proceeding and the burden is on the petitioner to show by a preponderance of the evidence that he is entitled to relief."). We review the district court's finding that a federal habeas petitioner convicted in state court was competent to plead guilty for clear error. *Bouchillon,* 907 F.2d at 594.

## A.

■■■ Petitioner argues the district court was clearly erroneous in finding that he was competent because Dr. Alexander testified at the evidentiary hearing that he was mentally retarded and incompetent when he pled no contest. Both Petitioner and Respondent introduced expert testimony at the evidentiary hearing regarding Petitioner's mental competency to plea. In preparation for the evidentiary hearing, Dr. Alexander evaluated Petitioner on behalf of Petitioner. Dr. Alexander testified that Petitioner claimed short-term and long-term memory loss, and delivered a fragmented recitation of his family, personal, and social history. Dr. Alexander testified that he administered a portion of the WAIS Test, but failed to administer the entire test. At the evidentiary hearing, Dr. Alexander conceded that the results may be unreliable because he did not administer the entire test. Based on his interview with Petitioner, Dr. Alexander determined that Petitioner is mentally retarded, has cognitive disability, has a serious deficit disorder, and does not possess the intellectual ability to understand legal proceedings. In sum, Dr. Alexander testified

---

**12.** The standard for determining competency to enter a guilty plea is the same as that required to determine competence to stand trial. *Godinez,* ── U.S. at ──────, 113 S.Ct. at 2685–86; *Wolf,* 430 F.2d at 444.

that Petitioner was incompetent at the time he entered the plea and remained incompetent at the time of the instant habeas proceeding.

Respondent arranged for Dr. Thompson, a forensic psychologist, to evaluate Petitioner prior to the evidentiary hearing. Dr. Thompson interviewed Petitioner for three hours, and performed a battery of testing on him the following day. The tests included the WAIS–R, the Wide Achievement Test, Wechsler memory scale, Rorshach Inkblot Test, Thematic Apperception Test, and the Bender Gestalt Perceptual Motor Test. Further, Dr. Thompson reviewed all prior psychological documentation and case notes, the criminal case file, and Petitioner's polygraph examination results.

Dr. Thompson testified at the evidentiary hearing that during the interview Petitioner initially claimed that he had short-term and long-term memory loss, could not remember his name, birth date, age, or his attorney's name. Petitioner portrayed a "stupified sort of appearance" and made inappropriate and bizarre statements to Dr. Thompson. Dr. Thompson testified that in informal discussions, however, Petitioner stated with particularity details concerning his family, other individuals, places he had lived, problems encountered with other inmates, and specific interactions with Mitchell. Thus, Dr. Thompson testified that he concluded Petitioner's claims of "global amnesia" were false. Further, Dr. Thompson testified that Petitioner's claim that he could not read or write was disproved by his own correspondence. On tests designed to assess memory and information, Petitioner scored so low as to indicate intentional malingering. On one test, Petitioner scored below chance, which subjects with verified memory problems do not. Intentional malingerers, however, score below chance more than 80% of the time. Dr. Thompson testified that results of the Rorschach ink blot test showed indications of depression but no indication of thought disorders. Dr. Thompson did not note memory deficits during the inquiry phase of the ink blot test. Based on indications of intentional malingering, documentation of intentional malingering in a prior evaluation, the results

of the tests he administered, and his observations of Petitioner, Dr. Thompson testified that Petitioner has a history of depression, some learning disability, and low intelligence. Dr. Thompson concluded, however, that Petitioner was not mentally retarded, but was malingering and attempting to portray himself in a bad light. In sum, Dr. Thompson determined that Petitioner was competent when he pled no contest and at the time of the instant habeas proceeding.

The district court rejected the conclusions of Dr. Alexander and adopted Dr. Thompson's finding that Petitioner was legally competent when he pled no contest in January 1990. Further, the district court found that Petitioner is a malingerer who maligns his psychological condition in order to obtain secondary benefits. The district court observed that Dr. Alexander's opinion that Petitioner is mentally retarded and incompetent to understand legal proceedings conflicted with the findings of Dr. Thompson and the two prior evaluations reviewed by Mitchell in his investigations. The district court found that Dr. Alexander's findings were based on Petitioner's intentional misrepresentation of his own conditions. The district court noted that Petitioner's claimed inability to read or write was patently false and refuted by correspondence he wrote while in custody.

In sum, the district court found that Petitioner had sufficient ability to consult with Mitchell with a reasonable degree of rational understanding, and that Petitioner had a rational and factual understanding of the charges and proceedings against. Consequently, the district court concluded that Petitioner was competent when he entered the plea and remained competent at the time of the habeas proceeding.

The record amply supports the district court's conclusion that Petitioner was competent at the time he pled no contest. Merely by highlighting Dr. Alexander's testimony, Petitioner has failed to demonstrate that the district court clearly erred in finding that he was competent to plea. *See United States v. Frank,* 956 F.2d 872, 875 (9th Cir.1991) ("Clear error is not demonstrated by pointing to conflicting evidence in the record."), *cert. denied,* —— U.S. ——, 113 S.Ct. 363, 121

L.Ed.2d 276 (1992); *United States v. Lindley,* 774 F.2d 993, 993 (9th Cir.1985) ("The district court did not clearly err in assigning more weight to the findings [of competence] of [two government] psychiatrists than to the contrary conclusion of a psychiatrist retained by the defense."). We therefore hold that the district court did not clearly err in rejecting the testimony of Dr. Alexander and finding that Petitioner was competent to plea based on the testimony of Dr. Thompson.

### B.

■ Petitioner also argues that the district court clearly erred in finding that he was competent when he is borderline mentally retarded, has a history of mental illness, and has been prescribed psychotropic medication and abused drugs and alcohol. Although Petitioner is of low intelligence, the district court found that he is not mentally retarded. Based on our review of the record this finding is not clearly erroneous. Petitioner's history of mental problems, low intelligence, psychotropic medication, and substance abuse do not establish that he was incompetent to plea. *See Wolf,* 430 F.2d at 445 ("The presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to . . . enter a plea. . . ."); *LoConte,* 847 F.2d at 751 (illiterate defendant with below average intelligence, history of drug abuse, and youth spent in institutions and state hospitals held competent to plea guilty to first degree murder); *Boag v. Raines,* 769 F.2d 1341, 1343 (9th Cir.1985) (defendant's repeated suicide attempts, repeated head injuries, stories of bizarre behavior, and alcoholism did not raise substantial doubt as to his competency to stand trial), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986). Consequently, we hold the district court did not clearly err in finding that Petitioner was legally competent when he pled no contest on January 26, 1990.

### III.

Finally, Petitioner argues the district court erred in finding that Mitchell provided effective assistance of counsel. Petitioner maintains he received constitutionally ineffective assistance of counsel because Mitchell: (1) did not investigate an incompetency or insanity defense, and (2) lied about DNA evidence to Petitioner's sisters.

■ "A claim of ineffective assistance of counsel presents a mixed question of law and fact which we review de novo." *Brewer v. Reynolds,* 51 F.3d 1519, 1523 (10th Cir. 1995). "We accept the factual findings of the district court unless they are clearly erroneous." *Id.*

■ The two-part inquiry of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs our review of an ineffective assistance of counsel claim. To support his claim for ineffective assistance of counsel, Petitioner must show that: (1) his attorney's performance was constitutionally deficient, and (2) this deficient performance prejudiced his defense. *Id.* at 687, 104 S.Ct. at 2064; *United States v. Cook,* 45 F.3d 388, 392 (10th Cir.1995). "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Consequently, the first prong of the *Strickland* test requires us to determine whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Our "scrutiny of counsel's performance must be highly deferential" and avoid "the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

■ If we determine that counsel's performance was constitutionally deficient, we proceed to the second prong of *Strickland,* the prejudice inquiry.[13] In measuring prejudice, the relevant question is whether

---

**13.** We do not imply that our inquiry must proceed in this order. "The Supreme Court has observed that often it may be easier to dispose of an ineffectiveness claim for lack of prejudice than to determine whether the alleged errors were legally deficient." *United States v. Haddock,* 12 F.3d 950, 955 (10th Cir.1993); *see also Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70; *Brewer,* 51 F.3d at 1523.

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068; *see also Brewer,* 51 F.3d at 1523. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071.

The Court discussed the broad duty of counsel to investigate matters that materially affect a client's case in *Strickland:*

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 104 S.Ct. at 2066. We examine the instant claim of ineffective assistance of counsel with these guiding principles in mind.

### A.

▮ Petitioner first contends he received constitutionally ineffective assistance of counsel because Mitchell failed to investigate either an incompetency or insanity defense to the charges filed against Petitioner. Petitioner argues that although Mitchell reviewed two prior psychological evaluations, a reasonably effective attorney would have obtained a current psychological evaluation before deciding not to pursue an incompetency or insanity defense. Because Mitchell failed to do so, Petitioner asserts he received ineffective assistance of counsel.

Mitchell testified extensively at the evidentiary hearing regarding his decision not to bring an incompetency or insanity defense on behalf of Petitioner. Mitchell testified that he reviewed the findings of Dr. Richard Stauffacher, a clinical psychologist, who eval-uated Petitioner in December 1988, shortly before he was questioned about the offenses that underlie the instant habeas petition. During the evaluation, Petitioner gave a detailed recitation of his family and social history. Dr. Stauffacher found no consistent signs of thought disorders, active suicidality, or uncontrolled aggressive impulsivity and diagnosed Petitioner as suffering from depression.

Mitchell testified that he also reviewed the 1986 findings of a Forensic Evaluation Team, and spoke with Dr. Serafino, one of the evaluators. The Forensic Evaluation Team evaluated Petitioner to determine his mental competency to stand trial on four counts of aggravated assault on a peace officer with a deadly weapon. Petitioner was able to provide the Forensic Evaluation Team with detailed facts regarding his background, family history, criminal record, education, employment, health, and problems encountered as an adolescent. A revised Beta examination demonstrated Petitioner's IQ ranged from sixty to seventy-eight.

Mitchell testified that the Forensic Evaluation Team documented evidence of intentional malingering by Petitioner. During the interview with the Forensic Evaluation Team, Petitioner intentionally portrayed his psychological condition as poor. When the Forensic Evaluation Team first administered a reading test, Petitioner performed at the fourth-grade level. After being confronted with charges of intentional malingering, Petitioner performed a reading test at the eighth-grade level. A Minnesota Multiphasic Personality Inventory ("M.M.P.I.") administered to Petitioner indicated intentional malingering. The "F" scale—commonly referred to as the "liar's scale"—was so high that the Forensic Evaluation Team could not accurately interpret the results of the M.M.P.I. The Forensic Evaluation Team rejected Petitioner's claims of amnesia as inconsistent with the detailed personal information he was able to provide, and observed that Petitioner "was voluntarily producing and presenting a number of false and exaggerated psychological symptoms."

The Forensic Evaluation Team concluded that Petitioner was depressed, but not mentally retarded, psychotic, or suffering from any gross organic brain disfunction. Fur-

ther, the Forensic Evaluation Team found that Petitioner had "fair insight and judgment," the capacity to understand the charges against him, the nature of the proceedings, and the ability to comprehend and assist his attorney in the preparation of his defense. In sum, the Forensic Evaluation Team established that Petitioner was not legally insane at the time of the offenses with which he was charged, nor was he incompetent to stand trial.

Mitchell testified that the results of his investigation of Petitioner's mental competency indicated that an incompetency or insanity defense would be futile. Mitchell testified that he concluded an incompetency or insanity defense was not viable because Dr. Stauffacher, Dr. Serafino, and the Forensic Evaluation Team had all concluded that Petitioner was competent, sane, and not mentally retarded. Mitchell knew Dr. Serafino, was familiar with his background, education, and experience, and believed that his expert opinions were respected in court. Thus, Mitchell testified that he was worried that an incompetency or insanity defense would permit the prosecution to introduce the damaging evidence of intentional malingering documented by Dr. Serafino and the Forensic Evaluation Team. Evidence of intentional malingering, Mitchell testified, would jeopardize an incompetency or insanity defense. Mitchell testified other factors indicated Petitioner's competency, including his employment as an emergency medical dispatcher, attainment of a G.E.D. and a driver's license, and general ability to communicate. Because he determined after inquiry that neither was a viable defense, Mitchell testified that he did not to pursue an incompetency or insanity defense through additional means, such as obtaining a current psychological evaluation.

The district court found that Mitchell made a strategic and tactical decision not to further investigate an incompetency or insanity defense. The district court concluded that Mitchell's decision was an exercise of sound judgment based on facts and prior experience. In sum, the district court found that Mitchell's representation of Petitioner did not fall below reasonable objective standards and did not violate Petitioner's right to effective assistance of counsel.

▮ Petitioner, however, contends that a reasonably effective attorney would have obtained a current psychological evaluation before concluding, based on old psychological evaluations, that incompetency or insanity defenses were futile. Petitioner directs us to authority from other circuits that he claims supports his contention that Mitchell did not render reasonably effective assistance under the first prong of *Strickland* when he failed to obtain a current psychological evaluation of Petitioner. We disagree.

The cases cited by Petitioner do not support his broad proposition that Mitchell's "duty to make reasonable investigations," *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, required Mitchell to obtain a current competency evaluation of Petitioner before he decided not to pursue an incompetency or insanity defense. Instead, the cases illustrate the Court's directive in *Strickland* that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Id.*[14]

Assessing the facts of the instant case in light of all the circumstances, and "applying a heavy measure of deference to counsel's judgments," *id.,* we find that Mitchell's decision not to obtain a current psychological

---

14. *See Hull v. Freeman,* 932 F.2d 159, 168–69 (3d Cir.1991) (counsel's decision not to put on evidence of incompetency at competency hearing held unreasonable because defendant had been recently declared incompetent by two doctors and had spent four years in state mental hospital after having been declared incompetent to stand trial); *Bouchillon,* 907 F.2d at 596–97 (counsel's decision not to investigate defendant's competency held unreasonable when defendant asked counsel whether insanity defense was possible and counsel knew defendant had mental problems, had been in mental institution, and had been repeatedly diagnosed with Post–Traumatic

Stress Disorder–Delayed); *Hooper v. Garraghty,* 845 F.2d 471, 474–75 (4th Cir.) (counsels' decision not to obtain current competency evaluation after another lawyer stated it was unlikely evaluation would prove defendant legally insane held unreasonable because defendant's family told counsel defendant was mentally ill, defendant asked for psychiatric treatment, and defendant had previously been diagnosed with mental problem), *cert. denied,* 488 U.S. 843, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988); *Profitt v. Waldron,* 831 F.2d 1245, 1248–49 (5th Cir.1987) (counsel's failure to investigate defendant's competency held unreasonable because counsel knew defendant

evaluation of Petitioner was an objectively reasonable decision supported by a reasonable investigation. *See id.; Bouchillon,* 907 F.2d at 596 n. 22 (emphasizing the importance under *Strickland* of a case-by-case analysis instead of a per se rule requiring current psychological evaluations when competency is potentially at issue). Contrary to Petitioner's characterization of the facts, Mitchell investigated the mental competency of his client—Mitchell reviewed two psychological evaluations and spoke with Dr. Serafino, one of the evaluators. Mitchell's investigation revealed that although Petitioner's intelligence is low and he suffers from learning disabilities and depression, he is sane, competent, and not mentally retarded. Further, Mitchell discovered that Dr. Serafino had documented evidence of intentional malingering and misrepresentation by Petitioner. Mitchell testified that based on his significant experience as a criminal defense attorney, evidence of malingering would jeopardize either an incompetency or insanity defense. Consequently, because Mitchell strategically chose not to obtain a current psychological evaluation of his client after a reasonable investigation into the facts, we reject Petitioner's invitation to second guess his decision. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time."); *Dever v. Kansas State Penitentiary,* 36 F.3d 1531, 1537 (10th Cir.1994) (counsel not ineffective for failing to further investigate post traumatic stress disorder as potential defense because counsel discussed defendant's mental state with psychiatrist and psychologist and decided after investigation that defense was futile). We therefore find that in deciding not to pursue an incompetency or insanity defense, Mitchell provided reasonably effective assistance of counsel to Petitioner. Because Petitioner failed to establish that Mitchell's representation was constitutionally deficient under the performance

prong of *Strickland,* we uphold the district court's conclusion that Mitchell provided Petitioner constitutionally effective assistance of counsel. *See Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071 (failure under either the performance or prejudice prong defeats the ineffectiveness claim).

### B.

Finally, Petitioner vigorously argues that Mitchell provided constitutionally ineffective assistance of counsel because Mitchell allegedly lied about DNA tests to Petitioner's sisters. Petitioner contends that a reasonably effective attorney would not have lied about DNA evidence to his client's family. Because Mitchell lied about DNA evidence, thereby leading Petitioner to believe he had no defense, Petitioner asserts he received ineffective assistance of counsel.

Petitioner's sisters testified at the evidentiary hearing that Mitchell told them that Petitioner should plead no contest because DNA tests conclusively established his guilt. Petitioner's sisters testified they urged Petitioner to plead no contest because DNA tests proved he had kidnapped, raped, and murdered the third convenience store clerk. In fact, DNA tests were never performed. Mitchell did not testify regarding Petitioner's allegations about the nonexistent DNA evidence.

After hearing testimony from Petitioner's sisters on Mitchell's alleged misrepresentation regarding DNA tests, the district court specifically rejected a finding proposed by Petitioner that Mitchell lied about DNA evidence. Indeed, the district court had already found that Petitioner's family's testimony was biased and incredible.

Whether Mitchell lied about DNA evidence to Petitioner's sisters presents an issue of fact that we review for clear error. *See Brewer,* 51 F.3d at 1523. Based on our review of the record, we do not believe the district court clearly erred in rejecting testimony that Mitchell lied about DNA evidence in order to indirectly convince his client that

had escaped from state mental hospital prior to committing crime and would have discovered defendant had been adjudicated insane by state court had counsel contacted mental hospital); *Wood v. Zahradnick,* 578 F.2d 980, 981–82 (4th Cir.1978) (counsel's failure to investigate defen-

dant's competency held unreasonable because defendant committed bizarre and violent crime, and defendant told lawyer he had used heroin and moonshine and had no memory of criminal act).

he had no defense. We therefore reject Petitioner's argument that Mitchell lied about DNA evidence, and find instead that Mitchell provided constitutionally effective assistance of counsel in his representation of Petitioner.

#### C.

We recently observed in a unanimous in banc opinion that we are troubled by how often we must confront meritless ineffective assistance of counsel claims. *See United States v. Galloway*, 56 F.3d 1239, 1242 n. 2 (10th Cir. May 26, 1995) (in banc) ("The abuse of ineffectiveness claims for tactical reasons has not only become a significant burden on courts and prosecutors, both state and federal, it is exacting a painful toll on the defense bar.").[15] We therefore remind counsel of the gravity of the claim.

 An ineffective assistance of counsel claim implies a damaging allegation—*i.e.*, it asserts that an attorney acted with such an appalling absence of professional competence "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[16] *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Simply put, an ineffectiveness claim alleges counsel committed disciplinable professional misconduct.[17] In the absence of facts that indicate "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, counsel should

not use the claim to scrutinize every criminal representation and conviction that does not terminate in an acquittal. Indeed, the Court has observed that we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, 104 S.Ct. at 2065, in order "[t]o counteract the natural tendency to fault an unsuccessful defense." *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986). In our experience, "[a]n attorney who accepts a criminal defense which does not lead to an acquittal is virtually assured a later accusation of ineffectiveness." *Galloway*, 56 F.3d at 1242 n. 2. Because an allegation of ineffectiveness broadcasts a professionally damaging message, counsel should consider whether the facts truly merit an ineffectiveness claim,[18] or if they merely demonstrate the Court's maxim that "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.[19]

#### IV.

In conclusion, we GRANT Petitioner's motion for a certificate of probable cause. We have exhaustively reviewed the record and carefully considered each of Petitioner's claims. For the aforementioned reasons we find that Petitioner has failed to demonstrate constitutional error in his state court conviction. We therefore AFFIRM the district

---

15. A computer search in Westlaw demonstrates that ineffective assistance of counsel claims are frequently raised in state and federal courts. On the filing date of this opinion, ineffective assistance of counsel allegations had been raised 7,972 times before federal courts, and 12,090 times before state courts since the Supreme Court announced its opinion in *Strickland*.

16. "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." U.S. Const. amend. VI.

17. An allegation that an attorney failed to provide effective assistance of counsel sufficient to guarantee a defendant's Sixth Amendment right to "counsel" necessarily asserts that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. In a Model Rules jurisdiction such as New Mexico, an attorney "shall provide competent representation to a client." Model Rules of Professional Conduct Rule 1.1; *see also* N.M.S.C.R.A. § 16–101 (same); Model Code of

Professional Responsibility DR 6–101(A)(1) (lawyer shall not handle a matter "which he knows or should know that he is not competent to handle"). In our view, conduct that "falls below an objective standard of reasonableness" under the Sixth Amendment more likely than not violates the obligation "to provide competent representation" as well.

18. We note that in both Model Rules and Model Code jurisdictions a lawyer is obligated to report suspected violations of professional ethical rules by fellow lawyers to the state disciplinary board. *See* Model Rules of Professional Conduct Rule 8.3; Model Code of Professional Responsibility DR 1–103(A).

19. In the event that a defendant or habeas petitioner insists that his counsel assert a meritless ineffective assistance of counsel claim, counsel should raise the ineffectiveness claim pursuant to the procedures provided in *Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967).

court's order denying Petitioner's petition for a writ of habeas corpus.

PAUL KELLY, Jr., Circuit Judge, concurring in part.

I concur in the Court's opinion, with the exception of Part III(C). The interrelationship between an ineffective assistance of counsel claim and state disciplinary rules has not been briefed and is not before us. That said, not every disciplinary violation constitutes ineffective assistance of counsel, *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986), and not every "ineffectiveness claim alleges counsel committed disciplinable professional misconduct," Ct.Op. at 41. Advising counsel to consider the professional implications attendant to raising an ineffectiveness claim, Ct.Op. at 41–42, creates a conflict of interest which could chill proper advocacy. I see no need to reach this issue, and therefore do not join in Part III(C) of the Court's opinion.