Argued and submitted July 22, 2014, affirmed August 19, 2015, petition for review denied January 14, 2016 (358 Or 529)

## MATTHEW D. BERG,
*Petitioner-Appellant,*

*v.*

## Mark NOOTH,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
09077474P; A147322

359 P3d 279

Rankin Johnson IV argued the cause and filed the brief for appellant.

Rolf C. Moan, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

In this post-conviction action, petitioner sought to set aside his no-contest plea to charges of attempted murder, first-degree kidnapping, and second-degree assault. Petitioner claimed that his plea was not voluntary because the prosecutor had threatened—if petitioner did not enter a guilty or no-contest plea—to prosecute petitioner's family members for witness tampering and to secure a judgment against petitioner's daughter for the $150,000 security amount associated with petitioner's release. The post-conviction court denied relief after determining, first, that petitioner had not proved that the prosecutor engaged in misconduct and, second, that petitioner's plea was "knowing and volunt[ary], not coerced." On appeal, petitioner argues that the post-conviction court erred in denying relief because he "only accepted the plea offer to protect his family from prosecution" and to avoid subjecting his daughter to a $150,000 judgment. For the reasons that follow, we conclude that the post-conviction court did not err in determining that petitioner's plea was not impermissibly coerced. Accordingly, we affirm.

## I.   THE FACTS

"We review post-conviction proceedings for legal error" and "are bound by the post-conviction court's findings of fact if there is evidence in the record to support them." *Clark v. State of Oregon*, 267 Or App 544, 549, 340 P3d 757 (2014), *rev den*, 357 Or 143 (2015). When the post-conviction court has not made explicit findings resolving all of the parties' factual disputes, we presume that the court implicitly resolved those facts "consistently with its ultimate conclusion," so long as the implicit factual findings are supported by the record. *Pereida-Alba v. Coursey*, 356 Or 654, 670-71, 342 P3d 70 (2015). We describe the pertinent facts in accordance with those standards of review.

A.   *Events leading up to petitioner's no-contest plea*

One morning in October 2006, ML, the victim in the underlying criminal case, called police to report that petitioner had held her against her will, in her bedroom, from early the previous evening until daybreak that

morning, when she had escaped. ML described a prolonged and severe physical attack that included beating with fists, a belt, and a table leg, as well as strangulation to the point of unconsciousness.

Sheriff's deputies arrested petitioner the next day. After being read his *Miranda* rights and acknowledging that he understood them, petitioner said that he "wasn't there," was not "even in town" and "didn't touch her." During an interview the following day, petitioner again denied that he had been at ML's home on the night of the reported assault.

In December 2006, ML told a deputy sheriff that petitioner "had called her from jail requesting she call the District Attorney and say the assault never happened." She also asserted that petitioner's family members had "called numerous times trying to get her to drop charges so [petitioner] could get out of jail." The deputy then listened to recordings of two phone calls that petitioner had made to ML from the jail on one day in November. In one call, petitioner asked ML "several times to call or write the District Attorney and state the assault never happened."

Petitioner subsequently was indicted on multiple felony and misdemeanor charges associated with the October 2006 attack. At some point, the court set a security amount of $150,000, and petitioner was released after his daughter posted a $15,000 deposit.[1] The parties engaged in plea negotiations in the months leading up to the July 2007 trial; the prosecutor made at least two offers, but the parties did not reach any agreement.

During a conference with the lawyers on the first day of trial, the court indicated its understanding that the state planned to file a "tampering with a witness" charge against petitioner. The prosecutor, Forster, said that she had

---

[1] Over the course of the underlying criminal proceedings, the court set different security amounts in association with various charges against petitioner. For purposes of this opinion, only one of those security arrangements matters: petitioner's release pursuant to an agreement that set a security amount of $150,000, and that allowed petitioner to be released after 10 percent of that amount had been posted.

not yet filed that charge, but that the state was preparing for petitioner to be arraigned on the charge later that day.[2]

Before the jury was seated, Forster moved the court for an order holding ML as a material witness. Forster asserted that, although ML had cooperated with detectives up until the Friday before the date set for trial, she had refused to cooperate with the state since then. The court explained the state's request to ML, who was present at the courthouse. ML said that she wanted to "amend [her] story" and asked the court if that would result in her going to jail. The court explained that the district attorney, not the court, would decide whether ML should be arrested if she changed her story. The court indicated that it would appoint counsel for ML and told her to remain in the courthouse until her attorney arrived. *Voir dire* took up the remainder of that court day.

In their opening statements, both Forster and petitioner's defense attorney, Scales, discussed how ML's description of the October 2006 events had changed over time. The state then began its case by playing a recording of a 9-1-1 call that had been made immediately following the alleged assault. Next, the state called a witness who testified that she had seen ML crying and barefoot on the morning after the attack, saying that "she needed to call the cops because [petitioner] was beating on her."

The state's next witness was ML, who acknowledged that she did not want to be in court and was appearing in

---

[2] In her post-conviction deposition, Forster explained that she "had a bunch of counts" of witness tampering with which she could charge petitioner, based on recorded jail calls in which he told people to "go talk to" ML. The post-conviction record also includes evidence showing that the criminal trial court had been prepared to allow the state to introduce recordings of calls that petitioner made from jail, including one in which ML asked petitioner why he did what he did to her, he responded that he "was just mad," and then said that he wanted to marry ML. The court also would have allowed the state to introduce defendant's recorded statement that he was going to be sentenced to "almost 70 years in prison," ML's response that petitioner was "not gonna do any time" and that she was going to help him. Moreover, Scales, petitioner's criminal-defense attorney, asserted that he had listened to a call from petitioner to one of his daughters (not the one who posted security for him) in which petitioner said "something along the lines of: You've got to tell [ML] not to come to court." Petitioner's daughter replied "something along the lines that she was not going to do that." Petitioner was upset by that response.

response to a subpoena. After questioning ML about various events that occurred between the October incident and the start of trial, Forster asked ML about her initial reports to police about the attack. ML testified that she had then "added more to the story than what really did happen" between her and petitioner. Forster asked ML if she had "added on" the part about petitioner beating her with a belt, and ML said no, and she implicitly acknowledged that petitioner had done that. ML then testified that petitioner had put his hands over her nose and mouth, and said that she had not exaggerated that part of her report to police. Similarly, ML testified that she had not been exaggerating when she reported that petitioner hit her all over her head and body many times; nor had she exaggerated when she reported that petitioner wrapped a bandana around her neck, tried to choke her, kicked her, and said that he was going to kill her. But ML testified that petitioner had not beaten her with a table leg. She said that she initially had accused petitioner of that because she "wanted him to hurt like [she] hurt."

The court took a lunch recess after ML gave that testimony. Scales then informed the court that the parties had reached a plea agreement. The court was presented with a signed plea petition in which petitioner pleaded no contest to charges of attempted murder, first-degree kidnapping, and second-degree assault. The court read the petition and asked petitioner whether he had had a chance to review it with his attorney. Petitioner said that he had. The court reiterated the rights that petitioner was waiving by entering a no-contest plea, and petitioner indicated his understanding. Petitioner also responded, "No," when asked whether anybody had made "any threats or promises to [him] other than this negotiation to enter this plea."

At that point, the court indicated that some promises had been made that would be placed on the record. Forster agreed and explained:

"[T]he agreement at this point is that * * * [petitioner] agrees to waive any right to appeal. The State has agreed that we will dismiss all other charges that are currently pending against [petitioner]. We will also dismiss [proceedings

against defendant in other cases]. We will agree not to file any other charges against [petitioner] with regards to Tampering or anything like that. \* \* \* We're agreeing to the ones that are charged or anything relating to this incident and this victim, [ML]. Um, we have agreed with [petitioner] that we will not proceed with any charges against [petitioner's sister, daughter, mother], or anybody else involved in this case that was involved in tampering with [ML]. \* \* \* We will not be requesting a judgment against [petitioner's daughter] for the $135,000 balance on the bail that was posted by [her]."

After engaging in further colloquy with petitioner, the court accepted petitioner's no-contest plea.

### B. *The post-conviction proceeding*

Petitioner challenged the voluntariness of his plea in a post-conviction proceeding that he initiated in 2009. In his second amended petition for post-conviction relief, petitioner alleged, among other things, that he had entered a "coerced plea" because the state had threatened witnesses. Specifically, he claimed that prosecutors had threatened to arrest members of petitioner's family for witness tampering if petitioner did not plead guilty; he also claimed that Forster had threatened to "go after" petitioner's family members "for the full amount of the $150,000 bail." Petitioner presented evidence in support of that claim during the post-conviction proceeding, including testimony from his mother, who asserted that Forster had threatened petitioner's family members with arrest.

In response, defendant superintendant argued that Forster had not threatened ML or petitioner's family members, but had "merely informed witnesses that they could face perjury charges if they lied under oath at petitioner's criminal trial." The superintendent submitted a transcript of Forster's deposition testimony, in which she took care to distinguish between, first, conversations she acknowledged having had with potential witnesses about the consequences of perjury and, second, any threats of bringing tampering-with-witness charges against petitioner's family members—which she denied having made. Forster acknowledged that she believed that petitioner's family members

had committed witness tampering and that she still could "proceed against that family for tampering with the witness" if she wanted to.[3] She also acknowledged that she had told Scales as much. However, Forster emphasized that her decision whether to charge petitioner's family members "had nothing to do with [petitioner] pleading." Thus, Forster specifically denied petitioner's claims that she had threatened to charge his family members with witness tampering if petitioner "didn't plead"; she also denied having "ma[d]e it known" that she would have petitioner's family members arrested for witness tampering unless defendant entered a guilty or no-contest plea.

With respect to the $150,000 security agreement, Forster acknowledged that she had told petitioner's daughter that she would petition the trial court for forfeiture of the full $150,000 in security "because [petitioner] had violated the [release agreement] by tampering while he was in jail." If Forster filed a witness-tampering charge against defendant based on that action, she explained further, she "could ask for forfeiture on the bail." Forster acknowledged having explained to petitioner's daughter that any judgment for the forfeited security amount would have been entered as a judgment against her:

"[Petitioner's daughter] had posted that bail. Her grandmother took her over there and had her post the bail. Grandma gave her the money to post the bail, and so that young girl—because grandma didn't want to be on the hook when they violated, so she put that young girl on the hook for $150,000. Grandma did that to her. Because grandma didn't want a judgment for 150 against her, so she thought, we'll do it to the granddaughter, because they don't have anything.

"Q.  Well, the little daughter there wouldn't even understand the concept—

"A.  She wouldn't, and grandma took advantage of her; and I was explaining that to her."

---

[3] The post-conviction record includes material supporting Forster's belief that petitioner's family members had committed witness tampering. Forster asserted that the family members "were threatening" ML and "were keeping her dog." In Forster's view, "[t]hey were tampering with her every which way they could."

The post-conviction record also includes evidence about the circumstances in which petitioner entered his plea. Scales said that petitioner had been "pretty confident that [ML] was not going to show up for trial," and that petitioner's "position changed drastically when she first showed up for trial." Scales himself was "very shocked" at the testimony that ML delivered, which he described as "very believable, very credible." Scales thinks that petitioner probably pleaded "no contest" after hearing ML's testimony because he was concerned about what was going to happen with his family members. When the parties met following ML's testimony, Scales asserted, Forster was "pretty aggressive" with petitioner, telling him that he could take an offer for a 180-month sentence or leave it. Forster also said that she could bring charges against petitioner's family members, and agreed to forgo prosecution "as part of the agreement on the plea offer." After Forster left the room, Scales discussed the offer with petitioner and "determined that for precisely these reasons, that he is doing this voluntarily":

> "And * * * I told him, 'What is going on with your mom or your sister or your daughter, those are threats. They are not—they are not related to your case.' Um, he still wanted to go forward with it."

Scales did not "think there was going to be any possibility of a plea until she—she came in, and * * * [ML] is the one who out-gamed us."

After taking the case under advisement, the post-conviction court entered a judgment denying petitioner post-conviction relief. The court explained:

> "Prosecutor was zealous, but insufficient evidence of misconduct. She did tell a number of witnesses that if they did not tell the truth, she would charge them with perjury. The only such witness who had a chance to at least start testifying was the named victim.

> "Plea was knowing and volunt[ary], not coerced. Petitioner had already rejected 2 prior offers, so knew it was up to him. He knew he could go to trial since he was already in trial when he took the deal.

> "Petitioner rejected all plea offers until after [ML] began testifying. He then decided to take a deal which cleared

all of his cases and kept all family members from being charged with tampering etc. Sentence was stipulated and had to be immediate while all trial witnesses still available if necessary."

It is that judgment from which petitioner appeals.

## II. THE PARTIES' ARGUMENTS ON APPEAL

Petitioner makes three narrow arguments on appeal, each related to his general contention that his plea was impermissibly coerced. First, petitioner makes a statutory argument, citing ORS 136.425, which provides that coerced confessions and admissions "cannot be given in evidence" against a criminal defendant, ORS 135.390, which requires courts to determine that defendants' guilty or no-contest pleas are "voluntary and intelligently made" before accepting those pleas, and two statutes that guide prosecutorial decisions regarding plea agreements (ORS 135.405 and ORS 135.415). Under those statutes, petitioner argues, "the plea bargain in this case was improper."

Second, petitioner argues that, because his no-contest plea was improperly coerced, he "did not voluntarily waive the various rights guaranteed to a criminal defendant" under Article I, sections 11 and 12, of the Oregon Constitution. Third, petitioner argues that his plea was involuntary and, therefore, obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

With respect to both of those constitutional claims, petitioner argues that the plea was involuntary because it was coerced through what he characterizes as the "prosecutor's threat to prosecute [petitioner's] family and to seek a $150,000 judgment from his daughter." The argument is narrow. Petitioner does not rely on any case-specific circumstances associated with the claimed "threats." Rather, he appears to argue categorically that a plea that is "based on considerations completely external to [the defendant's] culpability" and that is related to threats against a defendant's family members is involuntary as a matter of law. Thus, petitioner asks this court to hold that "a prosecutor should be forbidden to threaten to prosecute third parties,

or to level sanctions against them, as an inducement to the defendant."

In response, the superintendent first argues that petitioner's contentions cannot form a basis for post-conviction relief because petitioner "reasonably could have asserted—prior to entry of judgment in his criminal case—that the prosecutor's purported threats entitled him to withdraw his plea." Alternatively, the superintendent argues that petitioner's statutory claim is unpreserved and, in any event, cannot form a basis for post-conviction relief. With respect to petitioner's constitutional claims, the superintendent argues that petitioner did not prove that the prosecutor's actions deprived petitioner of due process or violated other constitutional principles.

## III. ANALYSIS

We begin by addressing the superintendent's contention that petitioner's involuntary-plea claim cannot form the basis for post-conviction relief. We reject that proposition. Under ORS 138.530(1)(a), a petitioner is entitled to post-conviction relief if he or she establishes a "substantial denial in the proceedings resulting in [the] petitioner's conviction * * * of [the] petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, * * * which denial rendered the conviction void." The Supreme Court has interpreted that statute to include a qualification:

> "When a criminal defendant fails to raise an issue at trial that the defendant reasonably could have been expected to raise, the defendant cannot obtain post-conviction relief on that ground unless the defendant alleges and proves that the failure to raise the issue was due to one (or more) of a few narrowly drawn exceptions."

*Palmer v. State of Oregon*, 318 Or 352, 358, 867 P2d 1368 (1994). Perhaps the most common exception to what is sometimes called "the *Palmer* bar" is the claim "that the failure to object constituted inadequate assistance of trial counsel." *Id.*

Significantly, the *Palmer* rule does not bar those claims that "could conceivably have been made but could

not reasonably have been expected." *Id.* at 357 (citation omitted). In our view, that category includes claims that a plea was not voluntary because it was unlawfully coerced, that is, "induced by fraud or improper threats." *Kinkel v. Lawhead*, 240 Or App 403, 414-15, 246 P3d 746, *rev den*, 350 Or 408 (2011). If a person has pleaded guilty or "no contest" only because he or she has been defrauded or unlawfully threatened, that person cannot reasonably be expected to promptly seek to withdraw the plea in the course of the same criminal proceeding. Indeed, in providing examples of claims that conceivably could have been raised at the criminal trial, yet still can form the basis for post-conviction relief, the Supreme Court identified those situations "where duress *or coercion* prevented assertion of the right." *Palmer*, 318 Or at 357 (citation omitted; emphasis added). We conclude that *Palmer* does not bar petitioner's post-conviction claim that his plea was impermissibly coerced and, therefore, involuntary.

We turn to the merits. As noted above, petitioner first argues that the prosecutor violated various Oregon statutes by, in petitioner's view, coercing petitioner's no-contest plea. That statutory claim was not included in petitioner's second amended petition for post-conviction relief. Accordingly, we do not address the argument further, except to note that petitioner has not explained how a claim based on a purely statutory violation could form the basis for post-conviction relief. *See* ORS 138.530 (specifying grounds for post-conviction relief, which do not include statutory violations); ORS 138.550(3) (any grounds for relief not asserted in a petition for post-conviction relief "are deemed waived" unless the court finds that they "could not reasonably have been raised").

That brings us to petitioner's constitutional arguments. In his second amended petition for post-conviction relief, petitioner claimed that his plea was impermissibly coerced in two ways: through Forster's threats to prosecute members of petitioner's family for witness tampering if petitioner did not enter a guilty or no-contest plea, and through Forster's threats to pursue a judgment against petitioner's daughter "for the full amount of the $150,000 bail" under

the same circumstances.[4] On appeal, petitioner argues that those threats rendered his plea involuntary under both the state and federal constitutions.[5] At the outset, we emphasize what petitioner did *not* argue below and does not argue to this court. Petitioner acknowledges Forster's stated belief that she would have been entitled to pursue a $150,000 judgment against petitioner's daughter if she could establish that petitioner violated the terms of his release by tampering with witnesses. Petitioner does not contend either that Forster was incorrect in believing that she could have pursued such a judgment or that she somehow acted in bad faith when she explained that possibility to petitioner's daughter. Petitioner also does not challenge Forster's assertion that she properly could have pursued witness-tampering charges against petitioner's family members.

Rather, with respect to his federal due process claim, petitioner advocates for a general rule that would *always* deem a guilty or no-contest plea involuntary when it is induced by what petitioner calls "extrinsic" threats, that is, a prosecutor's threats that do not relate directly to the criminal prosecution itself, but instead are threats to take action against third parties if the defendant does not accept the prosecutor's plea offer. In support of that argument, petitioner relies exclusively on the following footnote in *Bordenkircher v. Hayes*, 434 US 357, 98 S Ct 663, 54 L Ed

---

[4] On appeal, petitioner also alludes to Forster having stated that she would prosecute petitioner's family members for perjury if they lied on the stand. (Forster acknowledged in her deposition that she had told Scales, petitioner, and petitioner's family members who were potential witnesses that, "[i]f [the family members] lied on the stand, *** they would be prosecuted for perjury." She also told petitioner that, if those witnesses did not lie, "we've got no problems.") Petitioner did not claim below that his plea was involuntary because Forster threatened to prosecute potential witnesses if they lied. Accordingly, we do not address that issue further.

[5] In her deposition, Forster acknowledged that she had threatened to pursue a judgment against petitioner's daughter for the full $150,000 in security associated with petitioner's release, if petitioner did not plead guilty or "no contest." However, she denied that she had threatened to prosecute petitioner's family members for witness tampering in those circumstances. The post-conviction court did not make an express finding about whether, in fact, Forster threatened to prosecute petitioner's family members if petitioner did not enter a guilty or no-contest plea. We need not decide whether the post-conviction court *implicitly* found that no such threat occurred because—as explained in the body of this opinion—petitioner has not established that the post-conviction court erred in denying him relief, even assuming that the prosecutor *did* make such a threat.

2d 604 (1978), in which the Court explicitly reserved judgment on that question:

> "This case does not involve the constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person *other* than the accused, * * * which might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider."

*Id.* at 364 n 8 (emphasis in original).

As far as we are aware, no federal court of appeals has held, since *Bordenkircher* was decided, that a defendant's guilty plea must *always* be deemed "involuntary" if it was induced by a prosecutor's threat to take action against third parties unless the defendant entered that plea. To the contrary, each court that has addressed the question has held that "there is no 'intrinsic constitutional infirmity' in promising leniency to a third party in exchange for a guilty plea." *United States v. McElhaney*, 469 F3d 382, 385 (5th Cir 2006) (quoting *United States v. Nuckols*, 606 F2d 566, 569 (5th Cir 1979)); *see also, e.g., Miles v. Dorsey*, 61 F3d 1459, 1468 (10th Cir 1995), *cert den*, 516 US 1062 (1996) ("[A] plea is not per se involuntary if entered under a plea agreement that includes leniency for a third party."); *United States v. Marquez*, 909 F2d 738, 741-42 (2nd Cir 1990), *cert den*, 498 US 1084 (1991) (agreeing with "all of the other circuits that [had then] considered the issue * * * that a plea is not invalid if entered (1) under a plea agreement that includes leniency for a third party or (b) in response to a prosecutor's justifiable threat to prosecute a third party if the plea is not entered").

Rather than imposing a blanket ban on such pleas, federal courts generally have held that a plea may be considered voluntary so long as the prosecutor engaged in plea negotiations in good faith and had a proper basis for the threatened action against third parties. *See, e.g., McElhaney*, 469 F3d at 386 ("Where the prosecution has a good-faith basis to threaten charges against a third party, a defendant's election to 'sacrifice himself for such motives' is not a basis to challenge the voluntariness of the plea."). That is true even when the third party is the defendant's family

member. Thus, "so long as the government has prosecuted or threatened to prosecute a defendant's relative in good faith, the defendant's plea, entered to obtain leniency for the relative, is not involuntary." *Miles*, 61 F3d at 1468. Here, as explained above, petitioner has not challenged the prosecutor's asserted entitlement to pursue a judgment against petitioner's daughter for the $150,000 security amount based on her belief that petitioner violated the terms of his release agreement by tampering with witnesses before trial. Nor has he asserted that the prosecutor could not have pursued witness-tampering charges against petitioner's family members. Finally, he has not asserted that the prosecutor acted in bad faith.[6]

In sum, we have found no support for petitioner's categorical argument that plea agreements always must be deemed involuntary for due process purposes when they are induced by promises of leniency toward third parties or by threats to take actions against those parties if the plea offer is refused. We conclude that the post-conviction court correctly rejected petitioner's claim that his plea was impermissibly coerced in violation of the federal constitution.

We reject petitioner's state constitutional argument for similar reasons. In arguing that the Oregon Constitution prohibits prosecutors from using threats against third parties to induce a defendant to enter a guilty plea, petitioner relies primarily on *Lyons v. Pearce*, 298 Or 554, 560, 694 P2d 969 (1985), in which the Supreme Court explained that a defendant who pleads guilty must "understand the rights he is waiving and * * * waive them free from coercion." Petitioner asserts that his plea was impermissibly coerced because plea bargaining that involves a prosecutor's threat to seek a civil judgment from a third party "could extract 'a confession of guilt from one who is in fact innocent.'" (Quoting *State v. Nunn*, 212 Or 546, 553, 321 P2d 356 (1958).) In petitioner's view, pleas entered under such

---

[6] In addition, some courts have expressed the view that threats or promises related to third parties might induce defendants to enter false guilty pleas and, therefore, have concluded that courts must take "special care" to ensure that the pleas are voluntary. *E.g., Harman v. Mohn*, 683 F2d 834, 837 (4th Cir 1982). Here, however, petitioner has not claimed that the circuit court should have taken additional steps to ensure the voluntariness of his plea.

circumstances always must be deemed involuntary because a prosecutor's "extrinsic" threats against third parties are likely to coerce an innocent defendant into pleading guilty.

Petitioner offers no support for that categorical argument, and we are aware of none. As an initial matter, we observe that petitioner may implicitly be suggesting that *any* guilty plea is involuntary if made under circumstances that *could have* induced an innocent person to enter that plea. We reject any such suggestion. Many factors may influence a defendant's decision whether to enter a guilty or no-contest plea, such as the desirability of being convicted of fewer crimes than were charged, obtaining a lesser sentence than might be imposed following trial, avoiding the airing of facts that the defendant may wish to keep private, or of preventing vulnerable victims from having to testify. Depending on the circumstances, a defendant may feel that the benefits associated with those "intrinsic" factors present compelling reasons to plead guilty. And that may be true, in some cases, even when the defendant is innocent of the crimes charged. But that unsettling reality is inherent in the plea-negotiation process, which has been deemed "crucial to the proper functioning of the criminal justice system." *State v. Heisser*, 350 Or 12, 21, 249 P3d 113 (2011). Accordingly, it cannot be the case that a trial court can never accept a plea under circumstances in which it is *possible* that the defendant decided to accept the prosecutor's plea offer despite being innocent.

As we understand petitioner's remaining argument, it rests on two premises. First, petitioner contends that plea-negotiation considerations that are "extrinsic" to the defendant's prosecution—like the possibility that a prosecutor will pursue a judgment against a defendant's family member for a security amount, or seek to prosecute a defendant's family members—are *always* more likely to induce an innocent defendant to plead guilty than are the myriad of "intrinsic" factors that defendants routinely weigh when deciding whether to accept the state's plea offers. Second, petitioner necessarily—if implicitly—argues that the alleged increased likelihood that an innocent person will plead guilty is sufficient, standing alone, to render the person's plea involuntary when it is induced by "extrinsic" threats.

Because we reject the first necessary premise of petitioner's argument, we need not address the second. We perceive no basis on which we could conclude, as a categorical matter, that "extrinsic" threats always are more likely than "intrinsic" threats to induce an innocent person to plead guilty. As discussed above, even an innocent defendant could find that "intrinsic" factors—such as receiving a much lighter sentence than might be imposed after trial—present compelling reasons to plead guilty. And, depending on the circumstances, such a defendant might not be moved at all by various "extrinsic" considerations, for example, by a prosecutor's promise not to pursue charges against one of the defendant's relatives whom (unbeknownst to the prosecutor) the defendant detests. Because of the varied and nuanced considerations that inform any criminal defendant's decision whether to accept a prosecutor's plea offer, we decline to hold, as a matter of law, that extrinsic considerations are always more likely than intrinsic considerations to induce an innocent defendant to plead guilty.[7]

In this case, petitioner does not rely on any case-specific factors to support his argument that his plea was involuntary. Rather, as explained above, his appeal rests entirely on his contention that—as a matter of law—a prosecutor's "extrinsic" threats or promises made during the plea-negotiation process always will render a resulting guilty or no-contest plea involuntary. Because we have rejected that categorical proposition, petitioner's appeal presents no reason for us to disturb the post-conviction court's judgment.

Affirmed.

---

[7] As we have already noted, *see* 273 Or App at 110 n 6, some courts have opined that, because "extrinsic" threats *could* induce defendants to enter false guilty pleas, courts must be particularly careful in ensuring the voluntariness of pleas entered under those circumstances. That is far different from holding, as a matter of law, that *every* extrinsic threat renders a plea involuntary because it is likely to induce an innocent defendant to plead guilty.